[No. A085725. First Dist., Div. Two. Mar. 28, 2000.]

ROBERT B. DiMARTINO et al., Plaintiffs and Appellants, v.
CITY OF ORINDA, Defendant and Appellant.

COUNSEL

Law Offices of Donald W. Curran and Donald W. Curran for Plaintiffs and Appellants.

Lepper, Schaefer & Harrington and Gary Meredith Lepper for Defendant and Appellant.

OPINION

**KLINE, P. J.—**

### INTRODUCTION

The City of Orinda (City) appeals from a judgment of the Contra Costa County Superior Court, finding the City liable in inverse condemnation for the presence of a storm drainpipe under the residence of plaintiffs, husband and wife Robert B. DiMartino and Lise K. Tong. The City contends the evidence is insufficient to support findings that the City substantially participated in the construction, management or operation of the storm drainpipe or that it exercised dominion or control over the drainage pipe or that the pipe was part of a community-wide public drainage system.

Plaintiffs cross-appeal, arguing the court applied an erroneous measure of damages in awarding them the cost to relocate the pipe, rather than the asserted loss in market value of their property.

### FACTS AND PROCEDURAL BACKGROUND

On October 20, 1995, plaintiffs filed a complaint against the City seeking damages for negligence, trespass, nuisance and inverse condemnation. Trial proceeded only on the inverse condemnation cause of action. The matter was tried to the trial court and the following evidence was presented.

Plaintiffs own lot 37 within Tarabrook Unit No. 2 subdivision, as it appears on the subdivision map recorded with the County of Contra Costa (County) on February 18, 1948. A building permit was issued on May 25, 1956, for construction of plaintiffs' home. The residence itself is located south of public Tara Road and "sits some distance lower than the surface of Tara Road." Slightly northeast of plaintiffs' driveway, Tara Road is joined in a "T" intersection with Monterey Terrace, a private road.

As found by the court, "[a]ccess to Lot 37, otherwise described as 86 Tara Road, Orinda, California, is by Tara Road, a public street, 50 feet wide, which was constructed over a swale requiring a corrugated metal culvert beneath the public street to control and manage storm waters collected in an upstream swale and Tara Road."

Property to the north and uphill from Tara Road and the catch basin within the Tara Road right-of-way is mostly unimproved watershed or open space for a substantial distance up to the ridge line. The surface drainage of that watershed is led by natural topographic contours into the creek which terminates at the catch basin. It was undisputed that the natural flow of water, if unable to enter the catch basin on the north side of Tara Road, would flow across Tara Road and across plaintiffs' property because of the topography of the area.

The recorded map of the Tarabrook Unit No. 2 subdivision (dated June 1947) reveals five-foot-wide easements on both sides of the property line between lots 36 and 37. The drainage pipe at issue does not exist within those easements except where it "crosses the easement at one spot" in the transition between lots 36 and 37.

Instead, as found by the trial court, "[t]he surface storm water inlets and underground drainage facilities beneath Tara Road include an underground pipe connected to a manhole on Lot 36. [The lot adjacent to plaintiffs' lot 37.] From there the pipe continues diagonally across the 5 foot wide storm drainage easement and . . . under plaintiffs' carport, the home, and beneath the remaining unimproved portion of plaintiff's lot." The pipe was approximately 10 feet deep at the location of the manhole on lot 36 and came to the surface at its exit into the natural watercourse on the western edge of plaintiffs' property. The corrugated metal pipe was deteriorated, as its 40-year useful life had passed.

The City was incorporated in 1986. At that time it succeeded to the rights, duties and obligations of the County. In 1947 and 1948, subdivision map approval rested with the Contra Costa County Board of Supervisors. There is

no record that the board of supervisors required the subdivision developer to construct any improvements as a condition of acceptance and filing of the subdivision map and there is no record of the board's formal acceptance for maintenance of any of the streets or drainage easements shown on the map. There are no documents memorializing the construction of Tara Road, or any of the storm drainage facilities. However, it may reasonably be inferred, as the court did, that the underground metal culvert was constructed sometime before May 25, 1956, when the County issued a building permit to construct plaintiffs' home. It may also be reasonably inferred that "[e]ither the County of Contra Costa constructed the storm drain across plaintiffs' property, or the developer did at the time prior to the construction of the residence on plaintiffs' property by plaintiffs' predecessors" and that "the County of Contra Costa constructed that portion of the drainage under Tara Road, a public street, since it is unlikely that a private contractor did so for the private owner."[1]

In late 1995 or early 1996, during design stages of a planned remodel, plaintiffs discovered the storm drainpipe. Neither plaintiffs, their predecessors in interest in the property, the County, nor the City was aware of the pipe's location until plaintiffs' discovery.

The City admitted that the portion of the drainage system directly under the Tara Road right-of-way was constructed to protect Tara Road. Beth Thayer, the City's public works director and city engineer, testified that the portion of the storm drain running beneath the publicly maintained Tara Road would be maintained by the City. To the extent a pipe might exist south of Tara Road in the manner depicted in exhibit 5 (showing the subject pipe), she testified it was not included in the inventory of public works of the City. The City maintains facilities running from one side of a publicly maintained street to the other, and only within the right-of-way. The City does not consider a pipe on private property to be a public facility and does not maintain it, "unless it is an easement to and accepted by the County or the City for public maintenance . . . ."

Thayer also testified that prior to her coming to work for the City in October 1994, a consulting firm of hydrologists had been employed and was in the process of creating a draft storm drainage master plan for the City. As the new project manager, she reviewed the text and some of its conclusions and determined that "the foundation, the data that the consultant had been given to work with, was not adequate to provide the City with a useful tool,

---

[1]It may be that the County required a private developer to construct the portion of the drainage under Tara Road as a condition for subdivision approval. The legal effect here would be the same as if the County had constructed it.

and that substantial work would need to be done in order to create a document that we could use to determine which facilities were in need of upgrading." The document purported to be a survey of all storm drainage facilities or pipes 24 inches in diameter or more and the basis of the report was from a series of maps obtained by the City from the County, which showed drainage facilities. Thayer denied that exhibit 2 (a copy of one of the County source documents for the draft storm drainage master plan) indicated what culverts the consultants considered to be City owned, although acknowledging that the draft storm drainage master plan "purported to do so." The storm drainage master plan indicated which pipes were greater than 24 inches and deficient (that is the diameter of the pipe was insufficient to take the flow), greater than 24 inches and not deficient, and less than 24 inches and not analyzed. The storm drain across plaintiffs' property is represented by a dark black line entering plaintiffs' property, apparently along the described five-foot easement at the border of the neighbor's property (lot 36). The line then becomes a thin broken line as it turns across the rear of plaintiffs' property, representing a "channel" according to the map legend.[2] According to the legend on the storm drainage master plan map, a dark black line, such as that under Tara Road and entering along the easement, represents a "storm drain greater than or equal to 24 inches, not deficient or private," meaning that it was public. However, the City had not actually checked out the pipes. Thayer acknowledged referring to the City storm drainage master plan in a staff report of April 1, 1996, wherein she stated: "The City Storm Drainage Master Plan was prepared in draft form in 1994. Storm Drain Master Plan was developed by evaluating the capacity of *city-maintained* culverts greater than 24 inches." (Italics added.) However, Thayer denied that the dark black lines were City-maintained culverts in fact. She testified there were no maps showing the City-maintained culverts. The City storm drainage master plan was used by the City "as a starting basis for some of the calculations that were done to determine whether a particular facility is in any way, shape, or form a problem." Along with other information, such as a field examination of the actual facility, this information was used as a basis for analysis of storm drain capacity. There were no improvement plans for the subdivision Tarabrook Unit No. 2.

Plaintiffs' civil engineer testified that "runoff is draining off of Tara Road down into [plaintiffs'] front yard." However, such runoff was not measured or quantified. Plaintiffs' engineer, Howard Martin testified it would cost $35,000 to remedy the situation by relocating the storm drainage pipe into the existing easement. Plaintiff DiMartino testified that in its present

---

[2]We note again that this map does *not* represent the actual location of the drainpipe, which does not enter plaintiffs' property along the easement, but crosses the neighboring lot 36 to the manhole and then crosses across to plaintiffs' lot.

condition the house was worth from $525,000 to $550,000 and that if it did not have the storm drainpipe underneath and no storm waters flowed across the property, the value of the house would be $750,000.

The court issued its statement of decision on October 29, 1990, finding for plaintiffs in the sum of $35,000 (the cost to relocate the storm drainage pipe to the easement), plus attorney fees, statutory condemnation costs, and interest.

In ruling for plaintiffs, the trial court made several critical findings of fact and conclusions of law, which City contends were without support in the evidence. These included:

"5.1 The storm drain was constructed and installed with the substantial participation of the County of Contra Costa in design, direction, supervision and approval. [¶] . . . [¶]

"6.2 The purpose of the corrugated metal storm drain pipe is to provide storm drainage management of surface waters from Tara Road, emanating in part from runoff of uphill properties and in part from the road itself. The court concludes that the storm drain culvert is part of the community-wide system maintained by the City of Orinda. [¶] . . . [¶]

"8.1 The court concludes that Contra Costa County substantially participated in the planning, design, supervision and approval of the storm drain beneath plaintiffs' property. [¶] . . . [¶]

"8.2 The county substantially and directly participated in storm drainage management activity for public benefit by its community-wide storm drain system, which includes the deteriorating corrugated metal pipe located on and damaging plaintiffs' property."

Judgment was entered thereupon on December 22, 1998. This appeal and cross-appeal followed.

### I.  *City's Appeal*

" 'Article I, section 19 (formerly art. I, § 14) of the California Constitution requires that just compensation be paid when private property is taken or damaged for public use. Therefore, a public entity may be liable in an inverse condemnation action for any physical injury to real property proximately caused by a public improvement as deliberately designed and constructed, whether or not that injury was foreseeable . . . .' " (*Chatman v.*

*Alameda County Flood Control etc. Dist.* (1986) 183 Cal.App.3d 424, 431 [228 Cal.Rptr. 257], quoting *Souza v. Silver Development Co.* (1985) 164 Cal.App.3d 165, 170 [210 Cal.Rptr. 146].) "A storm drainage system constructed and maintained by a public entity is such a public improvement. [Citations.] An action in inverse condemnation will lie when damage to private property is proximately caused by use of a storm drainage system for its intended purpose. [Citation.] The fact that a part of the system may have been actually constructed by a private person will not insulate a public entity from liability, if the system has been accepted or otherwise approved by the public entity. [Citation.]" (*Souza v. Silver Development, supra,* 164 Cal.App.3d at p. 170; accord, *Chatman v. Alameda County Flood Control etc. Dist., supra,* 183 Cal.App.3d at pp. 431-432.)

■ The City contends reversal is required as there was insufficient evidence that the drainpipe was a public improvement. ■ "In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) We may not substitute our view of the correct findings for those of the trial court; rather, we must accept any reasonable interpretation of the evidence which supports the trial court's decision. However, we may not defer to that decision entirely. '[I]f the word "substantial" means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]. See also *People v. Johnson, supra,* 26 Cal.3d at p. 576; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1134 [234 Cal.Rptr. 630].)" (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1203-1204 [52 Cal.Rptr.2d 518].)

■ As we observed in *Wildensten v. East Bay Regional Park Dist.* (1991) 231 Cal.App.3d 976, 979-980 [283 Cal.Rptr. 13]: "To state a cause of action for inverse condemnation, the plaintiff must allege the defendant substantially participated in the planning, approval, construction, or operation of a public project or improvement which proximately caused injury to plaintiff's property. (*Holtz v. Superior Court* (1970) 3 Cal.3d 296, 302-304 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263-264 [42 Cal.Rptr. 89, 398 P.2d 129]; *Ullery v. County of*

*Contra Costa* (1988) 202 Cal.App.3d 562, 568 [248 Cal.Rptr. 727]; *Souza* v. *Silver Development Co.,* [*supra,*] 164 Cal.App.3d 165, 170 . . . ; see Landslide and Subsidence Liability (Cont.Ed.Bar 1974) § 8.3, p. 166; Condemnation Practice in Cal. (Cont.Ed.Bar Supp. 1990) § 13.3, pp. 241-242.)"

Having combed the record in vain for evidence in support of the trial court's judgment, we must conclude the court erred in holding the City liable in inverse condemnation.

As the court found, there is no record that the County "required the subdivision developer to construct any improvements as a condition of acceptance and filing of the Subdivision Map. There is no record of the Board of Supervisors['] formal acceptance for maintenance for any of the streets or drainage easements shown on the map." Although the subdivision map shows the location of the five-foot-wide reserved storm drainage easement on either side of the property line between plaintiffs' and their neighbor, the pipe was not located there. "The City's Storm Drainage Inventory Maps erroneously show a non-existent storm drainage, corrugated metal culvert within the reserved storm drainage easement, as shown on the Subdivision Map to be common to the boundary of Lot 36 and 37 . . . ." There are no other storm drainage easements or culverts of record on the privately owned lots, on the subdivision map, or City records. (Statement of Decision, ¶ 4.2.) The court could reasonably infer that the corrugated metal culvert was constructed sometime before May 25, 1956, when the building permit was issued to construct plaintiffs' house.

The absence of documents relating to the construction of the metal storm drain culvert or to the construction of Tara Road is striking. Although it is inferable that the corrugated metal pipe under the 50-foot-wide Tara Road right-of-way was deliberately designed and constructed to protect Tara Road, as conceded by the City, and that either the County or the developer constructed the storm drain across plaintiffs' property before their house was built, there simply is *no evidence* to support the conclusion that the County constructed, required or supervised the portion of the drainpipe running through plaintiffs' property. It is as likely that a private developer constructed this private drain to render lots 36 and 37 buildable.[3] There was no evidence whatsoever that the drain was "constructed and installed with the

---

[3]That the pipe was not placed along the easement makes it perhaps even more likely that the pipe was placed by a private developer. We do not second-guess the trial court on inferences it could reasonably draw from the evidence. The problem here is that there was *no* evidence from which the court could draw the inference that the pipe was installed by or under the supervision of the County rather than by a private person in order to benefit the private lots 37 and 36.

substantial participation of the County of Contra Costa in design, direction, supervision and approval." Indeed, no evidence was offered concerning the construction, design, supervision of construction or maintenance of the underground pipe—except denial of the City's ever having maintained it. The trial court expressly found that neither the County nor the City were reasonably aware of the pipe's location until plaintiffs' discovery of it. At no time did the County or the City expressly accept either the easements shown on the maps on plaintiffs' border with lot 36 or the underground pipe. No evidence revealed any prior request to the City or the County for maintenance, inspection or repair of the underground pipe.

The evidence here falls far short of that held sufficient to support imposition of inverse condemnation liability.

In *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591 [168 Cal.Rptr. 750], relied upon by plaintiffs and by the trial court in its tentative statement of decision, homeowners sued a city for inverse condemnation for damages resulting from the rupture of a storm drainpipe laid beneath their home. A previous owner had laid the pipe in the location of a natural watercourse running downhill. Pipes and catch basins installed by the city emptied their waters into this pipe. The appellate court reversed a judgment in favor of the defendant city, holding as a matter of law that the plaintiffs' damages had resulted from the city's "maintenance and use of a public improvement as deliberately planned and designed by the City" where the evidence showed (1) that the drainpipe had been installed by the previous homeowner under the supervision and direction of the city engineer; (2) the city knowingly used the pipe for drainage purposes over many years; and (3) the city *conceded* at trial that the pipe was part of its "storm drainage system." (*Id.* at p. 596.) Plaintiffs here rely upon language of *Marin* as follows: "The construction and maintenance of storm drainage systems are matters of 'public policy,' and such a system created by a public entity becomes a 'public improvement' and a 'public use.' [Citation.] 'Drainage systems concern the whole community.' [Citation.] [¶] Where a public improvement has been constructed and private property is proximately damaged in the maintenance or use of it, the fact that the work of construction was performed by a private property owner does not necessarily exonerate the public agency from liability. It is enough that the work is somehow *approved* or *accepted* by the public agency. [Citations.] Such an approval or 'acceptance need not be by formal action but may be implied from official acts of dominion or control over the property, . . .' [Citation.] And: 'Use of the land [for a public purpose] over a reasonable period of time constitutes an acceptance . . . , without any formal action in relation thereto by

governmental authority . . . .' (*McKinney* v. *Ruderman* (1962) 203 Cal.App.2d 109, 115 [21 Cal.Rptr. 263].)" (*Id.* at pp. 595-596.)

Particularly seizing upon the last sentence of *Marin*—that use for a public purpose over time constitutes acceptance—plaintiffs argue the storm drainage pipe here was used as part of City's public drainage system and, consequently, was impliedly "accepted" by County and City. Such construction separates *Marin* from its facts, particularly ignoring the city's concession in that case (absent here) that the pipe was part of its storm drainage system, as well as evidence that it was installed under the supervision of the city engineer, and was knowingly used for drainage purposes.

This distinction was recognized in *Ullery v. County of Contra Costa, supra,* 202 Cal.App.3d 562, affirming a trial court finding in favor of the public entities. In *Ullery,* landowners in abutting subdivisions sought damages for landslides allegedly caused by erosion from within an intermittent stream which provided storm drainage for its source, a 40-acre natural watershed. The county had expressly rejected an offer of dedication of a storm drainage easement by one subdivision's developer. After citing the passage of *Marin* quoted above, the *Ullery* court added, "[o]n the other hand, where 'there is no acceptance of a street or the drainage system within it, there is no public improvement, public work or public use and therefore there can be no public liability for inverse condemnation.' (*Yox* v. *City of Whittier* [(1986)] 182 Cal.App.3d [347,] 354 [227 Cal.Rptr. 311], fn. omitted.)" (*Id.* at pp. 568-569.) *Ullery* distinguished *Marin* on its facts from the situation before it where the county and the city "took no affirmative steps exhibiting dominion and control" over the creek (*id.* at p. 596); no employees or agents of these public entities participated in any improvement, maintenance or repair of the creek; the public entities and the public at large had no right of access to the creek as it was located on private property; and the public entities had expressly rejected the offer of dedication. That the creek was part of the drainage system of the 40-acre watershed was not sufficient to overturn the court's finding of no public use in the absence of any exhibition of dominion and control by the public entities. (*Id.* at pp. 569-570.)

*Ullery* also rejected the plaintiffs' attempt to analogize the county's subdivision map approval of the two tracts to acceptance of an offer of dedication. (*Ullery v. County of Contra Costa, supra,* 202 Cal.App.3d at p. 570.) "[I]nverse condemnation liability will not lie for damage to private property allegedly caused by private development approved or authorized by the public entity, 'where the [public entity's] sole affirmative action was the issuance of permits and approval of the subdivision map.' (*Yox* v. *City of Whittier, supra,* 182 Cal.App.3d at p. 353.)" (*Ibid.*) In so holding, *Ullery*

distinguished the case of *Frustuck v. City of Fairfax* (1963) 212 Cal.App.2d 345 [28 Cal.Rptr. 357] in which the private property damage resulted from the public entity's approval of significant upstream development which diverted storm waters from natural channels and the enlargement of facilities causing water to flow onto the plaintiff's property. *Ullery* also distinguished *Sheffet v. County of Los Angeles* (1970) 3 Cal.App.3d 720, 735 [84 Cal.Rptr. 11] in which the county had expressly accepted dedication of privately constructed streets, and thus became liable for damages caused by improper construction and inadequate drainage thereon. (*Ullery, supra,* at p. 570.)

*Chatman v. Alameda County Flood Control etc. Dist., supra,* 183 Cal.App.3d 424, appears similar to the case at hand insofar as it addresses the consequences of a lack of public entity participation or action. In *Chatman,* the appellate court affirmed summary judgment in favor of a water district in an inverse condemnation action by a homeowner whose house was subsiding due to erosion of a culvert built by a private developer, which culvert carried creek water under her property. The evidence showed the culvert was privately planned and built; the district did not plan, design, create, install, approve or accept the culvert; the district owned no easements or rights-of-way in the culvert; it had not maintained or repaired the culvert. Although the district had conducted channel-clearing activities in the creek, the portion cleared did not include the culvert under the plaintiff's property and neither that clearing nor the district's inspection of the culvert was sufficient to show control. (*Id.* at pp. 428, 431.) Nor did the district's requirement of preapproving all work done on the culvert manifest its control. "A homeowner frequently must obtain a building permit prior to repairing or remodeling his or her house. This does not imply, however, that the regulatory agency 'controls' that home." (*Id.* at p. 431.) The *Chatman* court concluded that "[b]ecause the District neither built, accepted, approved, nor maintained the culvert, it is not liable." (*Id.* at p. 432.)

In the instant case we face an evidentiary void. There is simply no evidence of any actions of either the City or its predecessor the County, from which the court could infer substantial participation in the construction, management or operation of the storm drainpipe or the exercise of dominion and control by either public entity.

Plaintiffs contend that the recording and filing of the subdivision map (exhibit 4) constitute government acceptance and approval of the drainage system for the subdivision, including the storm drainpipe under their home. However, they cite no authority for this proposition; it appears contrary to the express holdings of *Yox v. City of Whittier, supra,* 182 Cal.App.3d at page

353 and *Ullery v. County of Contra Costa, supra,* 202 Cal.App.3d at page 570; no such indication of acceptance or approval of either the storm drainpipe or the easement appears on the subdivision map itself (indeed, the actual location of the pipe is not indicated on the map); and it contravenes the finding of the trial court that neither the County nor the City had knowledge of the location of the pipe until its discovery by plaintiffs.

Plaintiffs argue that under the Subdivision Map Act in effect in 1947, when the subdivision map here was processed, express acceptance by the board of supervisors of offers to dedicate the drainage improvements was unnecessary and recordation must be deemed to constitute acceptance, absent an express rejection. Specifically, plaintiffs contend that "at that time the approval and recordation and/or filing of the Subdivision Map by the approving public agency is deemed acceptance of all of the dedicated rights-of-way and easements and improvements acquired by the map, unless the approving local agency has enacted an ordinance reserving its right to approve the dedicated easements and reservations when the improvements required by agreement with the subdivider are completed or the reservation of that right or rejection of the dedication is noted on the approved map when recorded or filed." Our review of the relevant provisions of the Subdivision Map Act in force during the time this subdivision map was processed and recorded (Stats. 1943, ch. 128, § 1, pp. 865-877, comprising former Bus. & Prof. Code, §§ 11500 to 11628) discloses no such scheme.[4] Like the current provision of the Subdivision Map Act (Gov. Code,

---

[4] At most, it provides with respect to tentative maps that "[i]n case there is no local ordinance, the governing body may, as a condition precedent to the approval of the map or maps of a subdivision, require streets and drainage ways properly located and of adequate width, but may make no other requirements." (Former Bus. & Prof. Code, § 11551, added by Stats. 1943, ch. 128, § 1, p. 869.) If no act is taken by the governing board within certain time limits, "the tentative map as filed shall be deemed to be approved and it shall be the duty of the clerk of the governing body to certify the approval." (*Id.,* § 11553, added by Stats. 1943, ch. 128 § 1, p. 870.) With respect to final maps, the act provided in relevant part, "[I]n event of dedication, there is required a certificate, signed and acknowledged by those parties having any record title interest in the land subdivided, offering certain parcels of land for dedication for certain specified public uses, subject to such reservations as may be contained in any such offer." (*Id.,* § 11590, added by Stats. 1943, ch. 128 § 1, p. 872.) "There is required a certificate for execution by the clerk of each approving governing body stating that the body approved the map and accepted or rejected on behalf of the public any parcels of land offered for dedication for public use in conformity with the terms of the offer of dedication." (*Id.,* § 11591, added by Stats. 1943, ch. 128 § 1, p. 872.) No such certificate was in evidence.

Finally, "[i]f at the time the final map is approved any streets are rejected, the offer of dedication shall remain open and the governing body may by resolution at any later date, and without further action by the subdivider, rescind its action and accept and open the streets for public use, which acceptance shall be recorded in the office of the county recorder." (Former Bus. & Prof. Code, § 11616, added by Stats. 1943, ch. 128, § 1, p. 876.)

§ 66477.1, subd. (a))[5] its predecessor required that the governing body accept or reject the offer of dedication at the time it approves the final map.[6] "The governing body *shall at that time also accept or reject any or all offers of dedication and may, as a condition precedent to the acceptance of any streets or easements, require that the subdivider, at his option, either improve or agree to improve the streets or easements.*" (Former Bus. & Prof. Code, § 11611, added by Stats. 1943, ch. 128, § 1, p. 875, italics added.) We see nothing in this language that equates silence by the governing body as to an offer of dedication with acceptance.

Indeed, the California Supreme Court held as much in 1946 in *Stump v. Cornell Construction Co.* (1946) 29 Cal.2d 448 [175 P.2d 510]. There, the plaintiffs argued the offer to dedicate certain streets had been rescinded prior to acceptance by the city. The court rejected this contention, holding that the offer to dedicate remained open, despite the city's implied rejection of an offer to dedicate a "future alley." According to the court: "[U]nder the Subdivision Map Act, words of dedication on a map are treated merely as an offer and that the dedication is not completed until the offer is accepted by the city. ([Former] Bus. & Prof. Code §§ 11590, 11591, 11611 and 11616.) Therefore, the words of dedication on the map filed in the present case must be regarded as an offer to dedicate." (*Stump v. Cornell Construction Co., supra,* at p. 451.) "The statute requires that the city either accept or reject an offer of dedication at the time it approves the final map. In the present case the city's acceptance of the offer to dedicate certain streets and alleys specifically excepted 'those strips marked "future street" and "future alley."' This constituted a rejection by the city of the offer to dedicate the 'future alley,' but by the terms of the statute the rejection was not final, the offer was deemed to remain open, and the city was authorized to rescind the rejection and accept the offer of dedication at any later date. The offer to dedicate the alley here involved was accepted and the dedication was completed in conformity with the statute by the resolution of the city council

---

[5]Government Code section 66477.1 currently provides as follows:

"(a) At the time the legislative body or the official designated pursuant to Section 66458 approves a final map, the legislative body or the designated official shall also accept, accept subject to improvement, or reject any offer of dedication. The clerk of the legislative body shall certify or state on the map the action by the legislative body or designated official.

"(b) The legislative body of a county, or a county officer designated by the legislative body, may accept into the county road system, pursuant to Section 941 of the Streets and Highways Code, any road for which an offer of dedication has been accepted or accepted subject to improvements."

[6]Effective January 1, 1999, Government Code section 66458, subdivision (d) was added to authorize the legislative body to adopt an ordinance that allows a designated official, instead of the legislative body, to approve or disapprove a final map, where the ordinance meets certain requirements. (Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1999 supp.) § 7.19, p. 95.)

on August 22, 1944." (*Id.* at pp. 451-452; see also *Galeb v. Cupertino Sanitary Dist.* (1964) 227 Cal.App.2d 294, 301 [38 Cal.Rptr. 580] [a dedication is not effective until the offer contained in the final map has been expressly accepted by the city]; Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) § 7.19, p. 179 [same].)

Consequently, were we to construe the reservation of five feet on either side of the property line and across the back of lots 37, 38 and 39 as appears on the subdivision map to constitute an offer to dedicate a drainage easement, it is well established that such words of dedication on the map do not *accomplish* a dedication, even upon recordation and filing of the map. Moreover, the storm drainage pipe was not located accurately on the subdivision map. Recordation and filing of the subdivision map did not effect an acceptance of the drainage pipe by the County.

Plaintiffs next contend that the use of the improperly located and installed corrugated metal pipe running under plaintiffs' home connected to the City-owned culvert crossing under Tara Road constituted an implied acceptance of the storm drainage system by the County and the City. The key question is whether connection of a private pipe segment to an admittedly public pipe segment converts the former to a public improvement. As the City points out, such a rule would allow circumvention of the Subdivision Map Act: a developer would no longer need to comply with requirements of dedication and acceptance, connection of any pipe on private property to a public roadway cross-culvert would transform the private pipe to a public one. We have found no case recognizing such a doctrine. Indeed, in *Chatman v. Alameda County Flood Control etc. Dist., supra,* 183 Cal.App.3d 424, an analogous argument was rejected where the court held that district maintenance of a portion of the creek did not transform the culvert flowing under the plaintiffs' property into a public improvement. (*Id.* at pp. 430-431.) Dedication to public use of Tara Road and the cross-culvert under it does not transform the maverick drainage pipe into a public improvement.

The court concluded that the drainage pipe under plaintiffs' property was used as part of a city-wide storm drainage system. This conclusion finds no support in the record. Were we to discount the testimony of Director of Public Works Thayer denying that the dark black lines were City-maintained culverts, we would still conclude there is no evidence in the record that the maverick drainage pipe was City-owned, controlled, or maintained. The storm drainage master plan map itself does not identify this drainage pipe as City-owned. Rather, it appears to identify the culvert crossing Tara Road as public, but at the point the pipe crosses over plaintiffs' lot it is indicated by

a broken line as a "channel."[7] There is no indication from the map that the drainpipe is other than private.

In sum, the record contains no evidence supporting the trial court's conclusion that the City or the County substantially participated in the planning, construction or maintenance of the subject drainpipe. There is no evidence that either public agency accepted a dedication of the drainage pipe, expressly or impliedly, or that either the City or the County ever exercised dominion and control over the pipeline. The only evidence in the record indicates that the pipe was likely laid at the same time as the culvert under Tara Road (an admittedly public improvement), using the natural drainage channel across the property and was connected to that pipeline at the storm drain manhole on the neighboring lot. The purpose of the pipe appears to have been entirely private: to permit construction of private residences on lots 36 and 37, which otherwise would have been unbuildable due to waters flowing in a natural watercourse.

## II. *Plaintiffs' Cross-appeal*

Plaintiffs cross-appeal from the court's award of $35,000 damages, contending the court applied a wrong measure of their damages in an inverse condemnation case. Our determination of the appeal and reversal for lack of substantial evidence, makes it unnecessary to consider this contention.

The judgment in favor of plaintiffs is reversed.

Haerle, J., and Lambden, J., concurred.

On April 26, 2000, the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied June 14, 2000.

---

[7]We again note the pipe is erroneously located on the storm drainage master plan as within the five-foot-wide easement as it leaves Tara Road.