Filed 3/22/16  P. v. Serebryakova CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ELENA SEREBRYAKOVA,<br><br>    Defendant and Appellant. | D068006<br><br><br><br>(Super. Ct. No. MH110688) |

APPEAL from an order of the Superior Court of San Diego County, Steven E. Stone, Judge.  Reversed with directions.

Suppa, Trucchi and Henein, and Teresa Trucchi for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Michael P. Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Elena Serebryakova (Appellant) appeals from an order after hearing which denied her petition for relief from a prohibition imposed upon her rights to

ownership or possession of a firearm.  (Welf. & Inst. Code,[1] § 8103, subd. (f)(1).)  She contends no substantial evidence supports the trial court's order, or alternatively, the court abused its discretion in denying a motion she made to reopen her case, at the end of the hearing while the court was issuing its order of denial.

Appellant is employed as a border patrol officer, and she became subject to the firearms prohibition after submitting to hospitalization for her own protection, at the recommendation of the psychiatrist who had been treating her for a few years for depression.  In September 2014, Appellant told her psychiatrist that she was having work-related problems and was considering taking pills to kill herself.  At the beginning of her hospitalization in September 2014, an emergency room nurse prepared an administrative record designating her admission as falling within the scope of section 5150, as a person who presented a danger to herself.[2]  Upon her discharge from the hospital three days later, the consulting doctor noted that her treatment had been voluntary in nature and referred her for elective outpatient care, which she pursued.  She

---

[1]    Statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2]    Section 5150, subdivision (a), part of the Lanterman-Petris-Short Act (§ 5000 et seq.; the LPS Act), reads in pertinent part:  "When a person, as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer [or designated mental health professional]. . . may, upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment in a facility" designated by the county and approved by the State Department of Health Care Services for such care.  When such a detention or apprehension has occurred, section 8102, subdivision (a), requires confiscation by law enforcement officers of any firearms in that person's possession.

2

was notified that her firearm had been confiscated and she could seek a hearing, pursuant to section 8103.

At the hearing on her request for relief from the statutory prohibition on use or possession of firearms, Appellant presented medical records and psychiatric testimony in support of her claim that she was never subject to an involuntary hold due to any referral made by law enforcement or other authorities, but instead she had acted on the recommendation of her treating psychiatrist to present herself for inpatient treatment. Appellant interpreted the terms of section 8103, subdivision (f)(1) as inapplicable, in that they prohibit the ownership or possession of a firearm by a person "who has been (A) *taken into custody* as provided in Section 5150 because that person is a danger to himself, herself, or to others, (B) assessed within the meaning of Section 5151, and (C) *admitted to a designated facility within the meaning of Sections 5151 and 5152 . . . .*"[3] (Italics added.)

Appellant thus argued her circumstances of voluntary treatment, however labeled, did not qualify under this definition and there was no statutory or factual basis to deny her the requested relief. (See *City of San Diego v. Kevin B.* (2004) 118 Cal.App.4th 933, 937 (*Kevin B.*) [power to seek forfeiture of firearms following an owner's reported mental health crisis is predicated on the assessment and evaluation required by the LPS Act;

_____

[3]     Section 5151 outlines the permitted time frame for LPS Act detention and evaluation, and further provides:  "Prior to admitting a person to the facility for treatment and evaluation pursuant to Section 5150, the professional person in charge of the facility or his or her designee *shall assess the individual in person to determine the appropriateness of the involuntary detention.*"  (Italics added.)  Section 5152 sets forth procedures for such evaluation, treatment, care, and release and referral.

absent a custodial assessment or evaluation, section 8102 did not permit a forfeiture order].)

Having reviewed the record, we conclude that in this context of an emergency mental health hospitalization that was voluntary in nature, the trial court misapplied the statutory criteria of section 8103, subdivision (f)(1). In light of the burden of proof stated in section 8103, subdivision(f)(6), the prosecutor did not demonstrate that at the time of hospitalization, Appellant had been taken into custody or placed in a facility for 72-hour treatment and evaluation treatment, within the meaning of the LPS Act, section 5150, subdivision (a). At the time of the hearing, there was no evidence controverting Appellant's showing that the hospitalization was voluntary and the requirements were not met to enable the statutory prohibition of section 8103 (applicable to a person *taken into custody* and admitted as provided in section 5150 et seq.) to go into effect. The trial court's order did not comply with the statutory scheme and lacks substantial support in the record. We reverse with directions to issue a different order granting the petition.

FACTUAL AND PROCEDURAL BACKGROUND

A. Hospital Treatment

As of September 2014, Appellant was 64 years old and had served as a customs and border protection officer for 20 years, with the Department of Homeland Security and its predecessor agency. She had immigrated to the United States from Russia while in her 20's and had previously pursued other training and careers. She started having depression problems when she lost her mother in 2001 and again in 2008 when she had serious complications of major surgeries and was unable to work for a time. Her

4

coworkers donated leave for her and she eventually recovered and returned to work. Since 2008, she has been seeing a psychiatrist, Dr. Nicodemus J. Garcia, M.D., and taking standard medications for depression and anxiety (Pristiq and BuSpar).

In September 2014, Appellant was having work-related issues with a new supervisor whom she felt had "singled her out" for "disciplinary punishment." She was very "upset" and in fear of losing her job. She went to Dr. Garcia on September 8, 2014, telling him she would take her own life if she lost her job, by taking an overdose of her depression pills. He recommended hospitalization and attempted to place her at Mesa Vista Hospital, but no bed was available. He advised her to go to the emergency room at Palomar or Pomerado Hospital and her sister, with whom she lives, took her to Pomerado on September 9, 2014.

During intake at the emergency room, hospital staff determined that they did not have a bed available for such treatment. Appellant knew that her health insurance would not pay for such care, and she requested and received admission after the psychiatric nurse at the emergency room filled out paperwork for an involuntary hold under section 5150. During her stay at the hospital, she signed a voluntary admissions form and was discharged to go home on September 12, 2014. In the hospital discharge documentation, psychiatrist Dr. Robert A. McAuley, M.D., noted that her treating psychiatrist had recommended that she pursue inpatient hospitalization, and she had been voluntarily hospitalized for the past 72 hours and had improved significantly. He evaluated her as having developed a number of strategies and plans to deal with her unsatisfactory work environment.

In the discharge documents, Dr. McAuley stated that he had discussed the issue of firearms with Appellant and had been reassured that she would not use her service pistol to harm herself, and in his opinion, it would be reasonable and safe for her to have access to and carry a firearm. He adjusted her medication to add Abilify and referred her back to her treating psychiatrist.[4]

Following Appellant's discharge, Dr. Garcia maintained her on her medications and referred her to an outpatient day program at Sharp Mesa Vista Hospital, which she voluntarily attended and paid for from September 26 through October 17, 2014. She returned to work on limited duty in early November 2014, but was unable to go out into the field because hospital admissions documents were filed with law enforcement authorities, indicating that she was not allowed to carry a firearm. (§ 8102, subds. (b), (c).) Her request for a hearing on the prohibition was filed on September 15, 2014. By January 2015, an evaluating psychiatrist found her to be fit for full duty, including firearms use.

### B. Hearing and Continuance

For the scheduled hearing on the petition on October 24, 2014, Appellant submitted subpoenaed medical records from her treatment at Pomerado and Sharp Mesa Vista hospitals. Dr. Garcia was available to testify at that time, but at Appellant's request, the matter was continued until April 13, 2015. At that time, the deputy district attorney

---

[4]    Abilify or aripiprazole is a medicine used to treat major depressive disorder (in combination with other antidepressants), or other conditions such as schizophrenia or bipolar disorder. Appellant's diagnoses did not include any psychotic features.

6

had just received the medical records, and the court considered postponing the hearing again, but after some discussion, both counsel represented they were ready to proceed.

The court accordingly received into evidence the subpoenaed records, as well as the January 2, 2015 "psychiatric fitness for duty evaluation" prepared by Dr. Dominic Addario, M.D., who testified at the hearing. Dr. Addario spent three and one-half hours interviewing Appellant and about six to seven hours reviewing her medical records, and concluded that she had voluntarily undertaken to be admitted to the hospital in September 2014, and had requested rather than resisted treatment. His review of the records indicated that her treating physicians felt she could safely and lawfully handle a firearm and was not a "threat to herself or others." She had been evaluated as a competent employee and she had never drawn a weapon at work, although she had been involved in various hostile situations in which she had to pursue individuals physically. Her symptoms were in remission, her prognosis was "excellent" and she was unlikely "to fall back into the major depression based upon possible stress factors at work."

According to Dr. Addario's review of the records, Appellant did not meet the requirements for an involuntary hold under section 5150, since she was not clearly a threat to herself or others nor unwilling to obtain treatment. In his evaluation of her fitness for duty, Dr. Addario stated that it was a "significant administrative misjudgment" on the part of Pomerado Hospital staff to place her on a section 5150 hold "simply because she had passive suicidal ideation, even though she was fully compliant and voluntary." He and Dr. McAuley thought her visit to Dr. Garcia, telling him she would take pills to kill herself, was more of a cry for help than an actual risk. Dr. Addario did

7

not see evidence in the records that she would be a threat to herself or others, such as if she had showed noncompliance with treatment or risk factors for impulsive behavior. Although some individuals with depression may act out violently, her profile did not show that she was likely to do so. She did not have a history of paranoia or problems with explosive behavior or losing control.

The court questioned Dr. Addario about when he talked to Appellant (in December for the three and one-half hour evaluation, and on the day of the hearing for 10 minutes) and whether he had talked to Dr. Garcia or Appellant's sister (no). Dr. Addario told the court he relied on Appellant's self-reporting that she was in compliance with her treatment plan. Appellant submitted another exhibit, a November 19, 2014 letter from Dr. Garcia, stating that he did not believe that Appellant was in any imminent danger of hurting herself or hurting others. The deputy district attorney did not object and the court identified the exhibit for the record and reviewed its contents, including Dr. Garcia's statement, "I am now recommending that she be allowed to return back to her previous job assignment. She feels she is ready. I truly feel she is ready to return to full duty. She had done her job for so many years and she claims to be very familiar with her job assignments and responsibilities. She reports she is physically able. I professionally believe she is emotionally and mentally stable to return to full duty."[5]

---

[5] Although the court did not formally admit the letter into evidence, it was identified for the record and relied on in the ruling. It has now been lodged with this court as an exhibit and may be considered in our review. (§ 8103, subd. (f)(5) [hearsay evidence permitted at such hearings]; *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 425-426 (*Rupf*).)

Appellant testified she had carried a firearm for 20 years at work and had never drawn it in the course of her duties. When she went to Pomerado that day at Dr. Garcia's recommendation, the nurse at the emergency room told her about putting her "on a hold" pursuant to "5150," but she did not understand what he meant. She understood she would be getting a bed at the hospital that way, and she stayed there for over three days, leaving when Dr. McAuley told her he thought she was ready. He had explained to her that he thought her stated intention to take an overdose of pills was merely an impulse and was not really a plan to do anything, and she agreed. She was most recently scheduled to see Dr. Garcia in early April, shortly before the hearing, but his office notified her he was away. On occasion, she also sees psychologists in his office and from her employee assistance program. She has received limited duty accommodations at work.

Appellant felt that she had benefited from her treatment and the outpatient program she attended, where she learned about how to handle different situations and understand the point of view of the other person. She paid for it herself, since her insurance would not cover it. Nobody told her that she should continue to participate in other outpatient programs. Appellant feels she does not get angry easily and rather was feeling upset at the time of her hospitalization, and had never threatened anyone. The medication she took reduced agitation.[6] The matter was submitted.

---

[6] At the hearing, the deputy district attorney inaccurately referred to Appellant's reported plan to overdose on her "antipsychotic medication," but the medications she was on at that time were antidepressants. The Abilify medication was added at the hospital, and is sometimes prescribed as an antidepressant or an antipsychotic medication. Appellant's diagnoses do not contain any references to psychoses.

9

In issuing its ruling, the court first noted that the burden was on the People to show by a preponderance of the evidence, which was not a high standard, that Appellant would not be likely to use firearms in a safe and lawful manner. The court characterized Dr. Addario as very well qualified and truthful, but it gave his testimony "very little weight." The court explained that the September 2014 incident was comparatively recent and Dr. Addario's report indicated that Appellant has continued difficulty in dealing with conflict at work and with anger. Although "there were a lot of equities in her favor," her own doctor had raised those as problematic issues. The court questioned why Dr. Addario had not interviewed Appellant more extensively or spoken to her other treating mental health professionals, such as the psychologist she had evidently been seeing recently, or her sister, rather than simply reviewing her medical records.

The court further expressed concerns that nothing had been presented about what Dr. Garcia thinks at this time, since his letter was a few months old and did not specifically address firearms. The court acknowledged that reasonable inferences could be drawn that the doctor did not think Appellant had a problem with firearms. In response, Appellant's attorney asked for a continuance or to reopen her case so that such testimony could be presented. The court denied the request, noting that the matter had already been continued once at Appellant's request and the burden was on the People.

The court next characterized Appellant's testimony as showing that she lacked insight into her depression, which had lasted since 2001 or 2008, and concluded that she was downplaying it. The court said that although she comes across as a very nice person who cares about her job, and who had properly sought medical help before, her agitation

during testimony (apparently, frustration or impatience during cross-examination) showed a different side of her. This raised concerns for the court that she might fail to seek help if she became distressed while back on full duty with a firearm. At that point, Appellant is reported as saying, "don't take it from me please."

Appellant's attorney again sought another continuance of the hearing for Dr. Garcia to testify, explaining that at the original hearing, the court had not planned on witnesses being called, which resulted in the current continuance. Counsel argued that Appellant's employment would be adversely affected if the restriction were not lifted. The court found no evidence had been presented on that subject and there was no good cause for delaying resolution of the case. Appellant's petition was denied and she filed this notice of appeal.

## DISCUSSION

Appellant argues the record demonstrates that the district attorney's office failed to carry its statutory burden to prove, by a preponderance of the evidence, that she would not be likely to use firearms in a safe and lawful manner. (§ 8103, subd. (f)(5), (6).) She points out that the evidence was essentially undisputed that her hospitalization was voluntary in nature, and argues that for purposes of applying the statutory criteria, the hospital admissions nurse's use of the LPS designation to facilitate Appellant's obtaining treatment and for insurance purposes should not be dispositive.

Appellant thus contends that no substantial evidence in her medical records, in Dr. Addario's testimony and evaluation that she was fit for full duty, or in her own testimony, supported the order denying her petition. Appellant further contends the trial court

11

abused its discretion in denying her motion to reopen her case to present testimony from Dr. Garcia.

# I

## *APPLICABLE LEGAL PRINCIPLES*

### A. Review

For a motion for relief brought under section 8100 et seq. (the firearms prohibition scheme), "[b]oth the gun owner and the authorities have the opportunity to present evidence of the gun owner's mental condition, including introduction of testimony by medical professionals. The [trial] judge's task is to consider the evidence presented, weigh the credibility of witnesses, and render a decision." (*Rupf, supra,* 85 Cal.App.4th 411, 424.) A broad range of evidence may be presented, including hearsay. (*People v. Keil* (2008) 161 Cal.App.4th 34, 37-38 (*Keil*); § 8103, subd. (f)(5).)

In reviewing a trial court's order on such a petition, we apply the substantial evidence standard. (*Rupf, supra,* 85 Cal.App.4th 411, 429.) " 'In determining whether a judgment is supported by substantial evidence, we may not confine our consideration to isolated bits of evidence, but must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court.' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336; *People v. Jason K.* (2010) 188 Cal.App.4th 1545, 1553 (*Jason K.*).) " 'We may not substitute our view of the correct findings for those of the trial court; rather, we must accept any reasonable interpretation of the evidence which supports the trial court's decision.' " (*Ibid.*) Substantial evidence is that " 'of ponderable

12

legal significance . . . reasonable . . . , credible, and of solid value . . . .' " (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) "While substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citation]." (*Ibid.*)

When determining the credibility of a witness, the court may consider matters that have "any tendency in reason to prove or disprove the truthfulness of [the] testimony at the hearing, including but not limited to any of the following: (a) [Her] demeanor while testifying and the manner in which [s]he testifies. [¶] (b) The character of [her] testimony." (Evid. Code, § 780, subds. (a), (b).) Demeanor evidence is an "elusive but significant type of evidence," that is relevant on issues of credibility. (*People v. Adams* (1993) 19 Cal.App.4th 412, 438.) "[D]emeanor evidence does not appear on the record, and for that reason has led to the rule that the fact-finder is the exclusive judge of credibility." (*Ibid.*)

In evaluating expert testimony, a trial court may reject some or all of the expert's conclusions, "so long as the rejection is not arbitrary." (*Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509; see *Keil, supra,* 161 Cal.App.4th 34, 39 [conc. opn. of Gilbert, P.J.].) The same principle applies to lay witnesses, even if the witness's evidence is uncontradicted. (*McKeown*, *supra*, at p. 509.) "Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact." (Evid. Code, § 411.)

13

"Substantial evidence review turns on whether the facts presented in each case support the findings of the trial court." (*City of San Diego v. Boggess* (2013) 216 Cal.App.4th 1494, 1502.) Looking to the specific facts reported in other published cases is unhelpful to a substantial evidence analysis. (*Ibid.*) Our concern is whether Appellant's petition for relief, or the trial court's denial of it, complied with the statutory scheme.

B. Interplay of LPA Act and Firearms Statutes

"*Section 8103 (and its counterpart section 8102*, which permits confiscation of firearms) are preventative in design; the fundamental purpose is to protect 'firearm owners and the public from the consequences of firearm possession by people whose mental state endangers themselves or others.' [Citation.] *These protective statutes* 'limit the availability of handguns to persons with a history of mental disturbance . . . to protect those persons or others in the event their judgment or mental balance remains or again becomes impaired.' " (*Jason K.*, *supra*, 188 Cal.App.4th 1545, 1558; italics added.)

Sections 8102 and 8103 ordinarily come into play when a person has been detained under section 5150, upon probable cause that he or she is a danger to himself or others. (*Keil*, *supra*, 161 Cal.App.4th 34, 37.) "A person who has so been detained may not own, possess, control, receive or purchase any firearm for a period of five years after the detention [citation], unless the person requests a hearing and the trial court finds that the People have not met their burden to show 'by a preponderance of the evidence that the person would not be likely to use firearms in a safe and lawful manner.' " (*Id.* at p. 38*; Jason K.*, *supra*, 188 Cal.App.4th 1545, 1557 [preponderance of the evidence standard

"properly allocates the risk of an erroneous judgment pertaining to firearm use between the government and an individual who was hospitalized after a finding that he or she presented a danger to himself or others (§§ 5150, 5151)."].)

In analyzing the scope of the counterpart statute, section 8102, this court in *Kevin B., supra*, 118 Cal.App.4th 933 discussed the procedural limits placed upon the police power to retain firearms. Normally, persons who have been " 'justifiably apprehended or detained to have their mental condition evaluated are subject to its reach.' " (*Id.* at p. 941; italics omitted.) Section 8102 " 'is not arbitrarily directed against anyone who owns or possesses a gun." (*Kevin B., supra,* at p. 941; italics omitted.) Rather, the firearms prohibition scheme "*establishes a system of correlative powers, duties and rights that arise when a law enforcement officer is confronted with a person who is a danger to himself or others as a result of mental illness*. . . . [¶] When, under section 5150, a person has been detained, section 8102, subdivision (a), requires that law enforcement officers confiscate any firearms or weapons in that person's possession. Upon the person's release the mental health facility which has evaluated the person must notify the law enforcement agency which confiscated the weapons [thus invoking the petitioning process for forfeiture or release]." (*Kevin B., supra*, 118 Cal.App.4th at p. 940; italics added.) "[I]t is not possible to read these provisions as permitting the forfeiture of firearms or weapons where a person has not received an assessment and evaluation of his or her mental condition." (*Id.* at p. 941.)

This court in *Kevin B., supra*, 118 Cal.App.4th 933, continued the analysis of permissible forfeiture of weapons under section 8102 by reading the statute's plain terms,

and concurring with the substantive due process analysis in *Rupf, supra,* 85 Cal.App.4th 411, 423, that "*the assessment and evaluation required by sections 5151 and 5152 are important limitations on the power to confiscate and withhold weapons.*" (*Kevin B., supra*, at p. 941; italics added.) Otherwise, the power to confiscate and forfeit weapons would not be adequately "tethered" to the assessment and evaluation required by sections 5151 and 5152, and "a risk arises that weapons will be taken from law-abiding citizens who in fact are not a danger to themselves or others." (*Kevin B., supra*, at p. 942.) We said, "*Given the literal language of the applicable statutes and the risk of erroneous confiscation and forfeiture, it suffices to conclude that in permitting confiscation and forfeiture of weapons, the Legislature intended that no permanent deprivation occur in the absence of the assessment required by section 5151 and, upon admission to a mental health facility, the evaluation required by section 5150.*" (*Kevin B., supra*, at p. 942; italics added.) In that case, the firearms owner was never "assessed or evaluated," and thus the City had no power to bring a petition under section 8102, subdivision (c), and the trial court's order had erroneously allowed forfeiture. (*Kevin B.*, *supra*, at p. 943.)

II

*ANALYSIS OF RECORD*

A. Statutory Criteria of Section 8103, subdivision (f)(1)

We first use a plain text, "literal reading" approach for evaluating the scope of section 8103, and then an alternative substantial evidence analysis of whether the hospitalization of Appellant was equivalent to that of a person required to have her mental condition evaluated under the LPS Act. (See *Kevin B., supra*, 118 Cal.App.4th

16

933, 941-942.) The interrelated statutory analyses in this area require a balancing of the risks among an individual's loss of the right to possess firearms and the state's strong interest in protecting society from the potential misuse of firearms by a mentally unstable person. (*Jason K.*, *supra*, 188 Cal.App.4th 1545, 1557-1558; see *Rupf*, *supra*, 85 Cal.App.4th at p. 422 [in applying section 8102, there need not be a relationship between "the weapons possessed and the incident precipitating the [LPS Act] detention"].)

In the case before us, Appellant arrived at the hospital under emergency mental health circumstances, but the record does not support a conclusion she was "detained" within the meaning of the LPS Act, section 5150. We draw this conclusion from the terms of section 5150, subdivision (a), which initially refers to "a person [who], as a result of a mental health disorder, is a danger to others, or to himself or herself." For such a person, appropriate public officials may, "upon probable cause, take, or cause to be taken, the person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention, or placement for evaluation and treatment" in an approved facility. (§ 5150, subd. (a).)

In turn, section 5150, subdivision (c) requires the facility officials to "assess the person to determine whether he or she can be properly served without being detained." Section 5151 outlines the permitted time frame for treatment and assessment and further provides that "[p]rior to admitting a person to the facility for treatment and evaluation pursuant to Section 5150, the professional person in charge of the facility or his or her designee shall assess the individual in person to determine the appropriateness of the involuntary detention." Under section 5152, the person taken into custody and admitted

17

to a facility on a 72-hour hold must receive an evaluation as soon as possible and appropriate treatment and information.

But here, the only invocation of LPS care under section 5150 was made by the emergency room admissions nurse, and apparently for purposes of ensuring payment for a certain category of care. It was not established at Appellant's hearing that she was taken "into custody" by public officials. (§ 5150, subd. (a).) The record does not show the kind of full assessment required by section 5151 was performed, by "the professional person in charge of the facility or his or her designee" of "the appropriateness of the *involuntary* detention," prior to admission for treatment and evaluation pursuant to section 5150. (§ 5151.)

In *Rupf, supra*, 85 Cal.App.4th at page 424, the appellate court explained that a trial court "may properly consider whether the circumstances leading to the section 5150 detention might occur again and whether possession or control of those confiscated weapons in such circumstances would pose a risk of danger to appellant or to others." Technically, there was no substantive section 5150 detention in Appellant's case, and as a matter of law, the forfeiture of her firearm rights was not adequately "tethered" to the assessment and evaluation required by section 5150 et seq. (*Kevin B., supra*, 118 Cal.App.4th at p. 942.)

## B.  Substantial Evidence Evaluation

Since inferences can be drawn that Appellant voluntarily sought out the same kinds of "assessment, evaluation, and crisis intervention, or placement for evaluation and treatment," that are described in section 5150, subdivision (a), we next consider if the

18

provisions of section 8103, subdivision (f) were properly invoked, even absent a "custody" or "involuntary detention" determination. (§§ 5150, subd. (a), 5151.) For our purposes, this translates into the inquiry of whether substantial evidence supports the trial court's determination that the People carried their burden of proof that Appellant was taken into custody, assessed and admitted to a facility because she was a danger to herself and others, as described in section 8103, subdivision (f)(1)(A), (B), and (C). (§ 8103, subd. (f)(6) [burden on prosecutor to show by a preponderance of evidence "that the person would not be likely to use the firearm in a safe and lawful manner."].) We examine each stated basis for the ruling and any supporting inferences.

In section 8103, subdivision (f)(2), (3), (4) and (5), the firearms prohibitions scheme provides for prompt notice to a patient detained at a mental health facility of the confiscation of weapons and the right to request a hearing. Appellant's request for a hearing was duly filed September 15, 2014, but the initial hearing on the petition, set for October 24, 2014, was continued until April 13, 2015. In the interim, Dr. Addario interviewed her and prepared his fitness for duty report January 2, 2015. One of the trial court's reasons for denying the petition was that only six months had passed since the hospitalization, possibly suggesting her treatment was incomplete and her status unknown. However, the lapse of time was not alone dispositive, since the statute allows for a prompt hearing.

In *Jason K.*, *supra*, 188 Cal.App.4th at page 1554, this court noted that a single incident leading to a section 5150 commitment can support a section 8103, subdivision (f) finding. In *Jason K.* the individual suffered from a "severe" depressive disorder and

19

had acted out violently under it, and his efforts to improve his mental health "did not necessarily show that it would not occur again, particularly when some of the stress factors that precipitated this incident were still present . . . [and] there was a reasonable basis for the court to find that the factors triggering the handgun incident had not been entirely eliminated, and that if there was another episode of mental instability, Jason could repeat this action, creating a serious safety concern for Jason and those around him." (*Jason K.*, *supra*, at p. 1554.)

In contrast, this Appellant's depression was repeatedly diagnosed as "moderate" and she had not acted out violently in the past. On a voluntary basis, she underwent a professional assessment and evaluation in an equivalent setting to those described in the LPS Act and firearms prohibitions scheme, about the risks to be posed by her ongoing access to firearms. There was conflicting evidence about the severity of the incident leading to the hospitalization and whether she or the experts thought the suicide threat (by pills, not gun) was made as a cry for help. The trial court's ruling expressed concerns that Appellant was downplaying the incident leading to her hospitalization, and she lacked insight into her depression. She also seemed to the court to become agitated during the progress of the hearing.

Certainly, the trial court had the responsibility to evaluate the credibility of Appellant as a witness, and we do not substitute our deductions for those it expressed. (Evid. Code, § 780, subds. (a), (b) [court may consider regarding truthfulness of testimony the witness's demeanor and character of the testimony].) However, witness credibility was not the entire issue, but only one factor toward evaluating the showing

20

required by statute. Under section 8103, subdivision (f)(6) the burden was placed on the government "to show the individual would not be likely to use the weapons in a safe manner." (*Jason K.*, *supra*, 188 Cal.App.4th at p. 1558.) The statute allocates risks between an individual's loss of the right to possess firearms and the state's strong interest in protecting society from the potential misuse of firearms by a mentally unstable person. (*Kevin B., supra*, 118 Cal.App.4th 933, 941-942.) Although the medical evaluators could not guarantee that Appellant would not have another episode of mental instability, they did not foresee that her restored firearms possession would raise any serious safety concerns for herself or others, in light of her previous "passive suicidal ideation" and the nonaggressive nature of the depressive disorder she had showed over the years, and which she had voluntarily addressed.

In view of the record as a whole, the trial court seemed, erroneously, to be placing the burden on Appellant to show she was unquestionably fit for firearms possession, rather than keeping the statutory burden on the district attorney's office to show there were specific reasons to conclude she would be dangerous to herself or others if her firearms access were restored. Dr. Addario testified that the existence of a depressive condition does not mean the person having it is unsafe or a threat to others, stating: "Millions of people have depression and behave in a perfectly appropriate manner." We are concerned that the inferences impliedly drawn by the trial court, that the hospitalization was the result of a severe threat demonstrating that Appellant had a present danger of engaging in firearms violence, did not "rest on the evidence" about the nature of her mental condition and depression, but rather, they amounted to speculation

21

or conjecture. (*Kuhn*, *supra*, 22 Cal.App.4th at p. 1633.) When the trial court rejected the whole of Dr. Addario's and Dr. Garcia's conclusions, it showed some degree of arbitrariness in faulting the procedures they used and in criticizing the extent of the investigation and interviews they performed. (See *Conservatorship of McKeown, supra,* 25 Cal.App.4th at p. 509.) Although Appellant did not explain why Dr. Garcia was not brought back to testify at the continued hearing on April 13, the record included consideration of his favorable letter and also showed that he was away at the time of her scheduled appointment as of early April.

Admittedly, both Appellant and the deputy district attorney could well have provided more evidence, but we must evaluate the record as it was developed and with attention to the burden of proof imposed by section 8103, subdivision (f)(6). In reversing, we determine only that the record as it currently stands does not support the order denying the petition and a different order must be directed. We need not resolve Appellant's additional claim of abuse of discretion in the denial of her motion to reopen her case to present testimony from Dr. Garcia.

DISPOSITION

The order is reversed with directions to grant the petition.

22

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.