Filed 3/17/20; Certified for publication 4/7/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SONIA RUIZ et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> COUNTY OF SAN DIEGO, <br><br> Defendant and Appellant. | D074654 consolidated with D075355 <br><br><br> (Super. Ct. No. 37-2016-00004183-CU-EI-CTL) |

APPEALS from a judgment and order of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Reversed with directions.

Thomas E. Montgomery, County Counsel and Norman Thomas Deak, Deputy County Counsel for Defendant and Appellant.

Thorsnes Bartolotta McGuire, Vincent J. Bartolotta, Karen R. Frostrom, and J. Domenic Martini for Plaintiffs and Respondents.

Laura E. Hirahara for California State Association of Counties and League of California Cities, as Amicus Curiae on behalf of Defendant and Appellant.

Sonia and Hector Ruiz's (together Ruiz) home flooded because their privately owned underground storm drain pipe rusted out over 50 years of use.  They sued the County of San Diego (County) for inverse condemnation, and after a bench trial the court entered judgment in their favor for $328,000—essentially the cost of replacing their metal pipe (the Ruiz pipe) with a reinforced concrete pipe.

The primary issue on appeal is whether a privately owned storm drain pipe located on private property, for which a public entity had rejected an offer of dedication, nevertheless becomes a public improvement because "public water" drains through it. We agree with the County that on this record and under settled law, the answer is no.  The County also contends that the trial court's alternative basis for imposing liability—that the County acted unreasonably in discharging water through a public drainage system that connects to the Ruiz pipe—also fails.  Even viewing the evidence most favorably to Ruiz, the evidence is insufficient to sustain the judgment on this theory.  Accordingly, we reverse with directions to enter judgment for the County.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Ruiz Property and Pipe*

In 1998, Ruiz purchased a single family home in an unincorporated part of the County (the Property).  The Property is at the east end of a valley (Valley).  Before the Ruiz's subdivision was developed, the natural watercourse in the Valley was a stream.[1]

---

[1]     A "natural watercourse" is " 'a channel with defined bed and banks made and habitually used by water passing down as a collected body or stream in those seasons of

2

The stream ran easterly, draining surface waters across the Property and continuing to a lake.

At some point before the area was developed in 1959, the Valley watercourse was improved with above-ground concrete lined channels, including one on the Property. These carried water to and across the Property.

In 1959, developers building homes in the Valley replaced the above-ground concrete channel with underground reinforced concrete pipe (RCP). The developers "essentially dropped the RCP pipe system right into that concrete drainage channel . . . ." This included the existing drainage channel on the Property—except that on the Property, instead of using RCP, the developer buried corrugated metal pipe (the Ruiz pipe) on top of the existing concrete-lined channel. As a result, Valley water that previously drained over the Property now went underground, allowing the lot to be developed.

The Ruiz pipe connects to and is a continuation of the Valley's storm drain system and is part of the natural watercourse.[2] There are about 10 private properties between the Ruiz pipe and the closest public street. Thus, the final 450 feet of the Valley pipeline

_____

the year and at those times when the streams in region are accustomed to flow. . . .' " (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 345 (*Locklin*).)

[2]     Although it may seem counterintuitive for a pipe to be part of a "natural" watercourse, *Locklin* states, "Alterations to a natural watercourse, such as the construction of conduits or other improvements . . . do not affect its status as a 'natural' watercourse." (*Locklin*, *supra*, 7 Cal.4th at p. 345.) "A natural watercourse . . . may include new channels created in the course of urban development through which waters presently flow." (*Ibid*.)

3

before reaching the Ruiz pipe is also on private property. The following diagram depicts the Property with the Ruiz pipe.:



The County did not design, construct, install, or maintain the Ruiz pipe. The County does not own the pipe—Ruiz does. In 1959, the developer offered to dedicate an easement to the Ruiz pipe; however, the County did not accept that offer.

B. *Valley Drainage Into the Ruiz Pipe*

In the photograph below, the Property is in the upper right, denoted as "530 Broadview St." The upstream drainage area boundary—the "tributary area"—is marked by the dotted line. The tributary area contains private homes and public streets—a

substantial part of which is in City of San Diego (City) jurisdiction. A "fair amount" of the water in the drainage system originates from property within the City's jurisdiction.



Water in the tributary area drains into curb inlets, underground pipes (some publicly and some privately owned), through the Ruiz pipe, and ultimately discharges near a freeway. The image below shows part of the system's flow near the Property.



C. *Flooding*

In December 2014 and again in January 2016, the Property flooded during rain, damaging furniture and floor coverings in Ruiz's home. The flooding occurred because part of the bottom of the Ruiz pipe had rusted away. Ruiz's civil engineering expert, Joel Morrison, testified that constant water runoff from upstream privately owned homes was alone enough to cause the pipe to rust out over the years. The useful life of corrugated metal pipe is about 30 years. The Ruiz pipe, which lasted about 50 years, simply outlived its useful life.

6

Shortly after the 2016 flood, Mr. Ruiz repaired the pipe by patching the rusted-away bottom with cement and reconnecting the pipe to a junction. The parties dispute the adequacy of this repair—Ruiz's expert calling it a "band-aid" while the County's expert testified the pipe should now last another 10 to 15 years. In any event, it is undisputed that the Property has not flooded since Mr. Ruiz's repair.

D. *Litigation*

When Ruiz purchased the Property in 1998, they were unaware of both the pipe and the manhole providing access to it.[3] Mr. Ruiz did not notice the manhole until after the December 2014 flood. Although Mrs. Ruiz saw the manhole in 1999, she did not know what it was and ignored it.

Ruiz sued the County for trespass, nuisance, inverse condemnation, and declaratory relief. At trial, Ruiz's attorney asserted "two alternate theories" of liability: (1) The County acted "unreasonably" in discharging water through the Ruiz pipe without inspecting or maintaining the pipe; and (2) By using the Ruiz pipe for 50 years, the County has "taken an easement over that drainage facility," requiring the County to maintain the Ruiz pipe.[4] In a posttrial hearing Ruiz's attorney summarized her theories,

---

[3] Only the lip of the manhole is on the Property; the rest is on Ruiz's neighbor's property.

[4] In closing argument, Ruiz's counsel alluded to a third theory, stating the County was liable because the "storm drain is a public improvement, and they have an obligation if a public improvement causes damage." To the extent these remarks imply a strict liability standard, on appeal Ruiz concedes that the California Supreme Court has not

7

stating, "The position I took during trial in [*sic*] that this is a public work as part of an integrated system that the County used unreasonably without a plan for maintenance. And that's the basis for liability."

After a bench trial, the court issued a statement of decision in Ruiz's favor for inverse condemnation. The court found that "the continuous use of causing public water from the County's drains and inlets through the metal storm drain pipe on the [Ruiz] property caused the pipe to deteriorate and fail, which in turn caused the flooding and damage to [Ruiz's] property." The court found that the County implicitly accepted a drainage easement "requiring the County to maintain the pipe." Citing *Skoumbas v. City of Orinda* (2008) 165 Cal.App.4th 783 (*Skoumbas*), the court held that the County's "interest and control of an integrated drainage system makes the [County] liable for the [Ruiz's] damages caused by the [County's] unreasonable diversion of water though the [County]-owned portions of the storm drain system to [Ruiz's] private property." The court dismissed Ruiz's causes of action for trespass and nuisance.[5] The court awarded Ruiz $322,441, representing the cost to replace the metal pipe with RCP, plus other

---

applied strict liability in inverse condemnation cases involving public improvements designed to protect against property damage caused by flooding.

5    Neither the statement of decision nor the judgment mentions Ruiz's cause of action for declaratory relief. There is no cross-appeal. (See *Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585.)

damages for a total award of $328,033. Subsequently, the court awarded Ruiz

$529,540.40 in attorney fees and costs.[6]

## DISCUSSION

### I. *THE TRIAL COURT'S FINDING THAT THE COUNTY IMPLICITLY ACCEPTED A DRAINAGE EASEMENT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE*

#### A. *Introduction*

To prevail on inverse condemnation, "the property owner must show there was an invasion or appropriation (a 'taking' or 'damaging') by a public entity of some valuable property right possessed by the owner, directly and specially affecting the owner to his detriment." (*Prout v. Department of Transportation* (2018) 31 Cal.App.5th 200, 211 (*Prout*).)

Here, Ruiz contends that the County's 50-year use of their pipe as part of the Valley drainage system "constitutes an acceptance" of a drainage easement and concomitant duty to maintain the pipe—even though in 1959 the County rejected the offer of dedication. The trial court agreed with Ruiz, stating:

> "I want to make very clear for the record, for the appellate court
> that . . . . [t]he usage and the way that water was used to come down
> to the Ruiz property, that the County implicitly took that pipe and
> had an easement to run that water through the Ruiz property."

Elaborating, the court found that by using the Ruiz pipe "for drainage of surface water over fifty years," the County had exercised the requisite "dominion and control"

6    The County's separate appeal from the postjudgment order awarding attorney fees is *Ruiz et al. v. County of San Diego*, D075355.

9

required to impliedly accept the offer of dedication. The County contends this finding is not supported by substantial evidence.

B. *The Standard of Review*

"Inverse condemnation presents a mixed question of fact and law. [Citation.] We review the trial court's determination of the historical facts for substantial evidence; we review de novo the applicable law and application of that law to the facts." (*Prout*, *supra*, 31 Cal.App.5th at p. 211.)[7] When all the material facts and reasonable inferences from those facts are undisputed, and only one correct legal conclusion may be drawn from those facts, the reviewing court is not bound by the trial court's ruling. (*Sprunk v. Prisma LLC* (2017) 14 Cal.App.5th 785, 794.)

C. *Using the Ruiz Pipe as Part of the Watercourse, Without More, Does Not Make it a Public Improvement or Constitute Implied Acceptance of a Drainage Easement*

A private landowner may transfer an interest in real property to the public by making an offer of dedication. However, "[t]here must also be an acceptance by the public of the offer to dedicate. [Citation.] Acceptance may be express or implied." (*Baldwin v. City of L. A.* (1999) 70 Cal.App.4th 819, 837.) Until an offer of dedication has been accepted, there is no public property interest. (*Ibid.*)

---

7    Citing *San Diego Metropolitan Transit Development Bd. v. Handlery Hotel, Inc.* (1999) 73 Cal.App.4th 517, Ruiz contends the applicable standard of review is " 'substantial evidence.' " However, review in this case is neither entirely de novo nor entirely limited by the substantial evidence rule. *Handlery Hotel*, which applied substantial evidence review to factual determinations and independent review to legal questions, is consistent with our approach. (*Id.* at p. 528.)

Here, the parties stipulated that the County did not accept the offered dedication of an easement to the Ruiz pipe. In determining whether the County nevertheless impliedly accepted the dedication by conduct, the parties cite four cases: *Locklin*, *supra*, 7 Cal.4th 327; *DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329 (*DiMartino*); *Ullery v. County of Contra Costa* (1988) 202 Cal.App.3d 562 (*Ullery*); and *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591 (*Marin*). We discuss each in turn.

The *Locklin* plaintiffs were downstream property owners along a natural watercourse—a creek. Public upstream development (paved streets and other public areas) increased the volume and velocity of water flowing into the creek. The increased flow eroded the creek's banks, damaging the plaintiffs' property. (*Locklin*, *supra*, 7 Cal.4th at p. 339.) Like Ruiz, the *Locklin* plaintiffs sued for inverse condemnation, asserting that public entities had transformed the watercourse into a public work of improvement by discharging water into it. (*Id*. at pp. 340-341.) The California Supreme Court rejected that argument, stating:

> "Utilizing an existing natural watercourse for drainage of surface water runoff . . . does not transform the watercourse into a public storm drainage system. A governmental entity must exert control over and assume responsibility for maintenance of the watercourse if it is to be liable for damage caused by the streamflow on a theory that the watercourse has become a public work." (*Locklin*, *supra*, 7 Cal.4th at p. 370.)

Viewing the evidence in the light most favorable to Ruiz, and applying *Locklin*'s analysis, as we must, the Ruiz pipe has not become a public work. The County's use of that pipe as part of a public drainage system does not, without evidence of "control" or

11

"maintenance" transform the privately owned pipe into a public work. (*Locklin*, *supra*, 7 Cal.4th at pp. 370-371.)

Moreover, even without *Locklin*, we would reach the same conclusion. *DiMartino* is particularly instructive because its facts are strikingly similar to Ruiz's case. There, as here, the plaintiffs' property was developed in the 1950's. (*DiMartino*, *supra*, 80 Cal.App.4th at p. 332.) As here, before development the natural watercourse flowed across the plaintiffs' property. (*Ibid.*) Also like Ruiz's case, the developer in *DiMartino* installed a metal pipe under the plaintiffs' property as part of a system to manage storm waters collected on public roads. (*Ibid.*) And like Ruiz's case, the public entity in *DiMartino* did not accept an offer of dedication of an easement over that pipe. (*Id.* at p. 333.)

Some 40 years later, the *DiMartino* homeowners discovered the metal pipe had deteriorated. (*DiMartino*, *supra*, 80 Cal.App.4th. at pp. 332-333.) Much like the trial court's decision here, in *DiMartino* the trial court determined the public entity was liable because it " 'substantially and directly participated in storm drainage management activity for public benefit by its community-wide storm drain system, which includes the deteriorating corrugated metal pipe located on and damaging plaintiffs' property.' " (*Id.* at p. 335.)

The appellate court in *DiMartino* reversed. The Court of Appeal framed the issue: "The key question is whether connection of a private pipe segment to an admittedly public pipe segment converts the former to a public improvement." (*DiMartino*, *supra*, 80 Cal.App.4th at p. 343.) Ruiz similarly frames their theory, stating: "The County

12

utilized the [Ruiz] pipe as an integral and necessary part of the County storm drain system for over 60 years. This use constituted an implied acceptance of the drainage easement that the County initially rejected, and this acceptance converted the pipe to a public improvement."

The Court of Appeal in *DiMartino* rejected the plaintiffs' contention that the public entity's use of their private pipe for area drainage was, without more, enough to impliedly accept the offer of dedication. Such a rule, the Court of Appeal stated, would circumvent the Subdivision Map Act because "a developer would no longer need to comply with requirements of dedication and acceptance, connection of any pipe on private property to a public roadway cross-culvert would transform the private pipe to a public one. We have found no case recognizing such a doctrine." (*DiMartino*, *supra*, 80 Cal.App.4th at p. 343.) Absent evidence that the public entity planned, constructed, or maintained the privately owned metal pipe, the *DiMartino* court concluded, "The purpose of the pipe appears to have been entirely private: to permit construction of private residences . . . which otherwise would have been unbuildable due to waters flowing in a natural watercourse." (*Id*. at p. 344.)

On similar facts, the Court of Appeal in *Ullery* also rejected an inverse condemnation theory. There, landowners sued a county for inverse condemnation when landslides resulted from erosion caused by a natural watercourse of a 40-acre watershed, part of which consisted of a creek on their private property. (*Ullery*, *supra*, 202 Cal.App.3d at pp. 566, 567.) The trial court found the public entity was not liable because it (1) owned no part of the creek bed; (2) had expressly rejected the developer's

13

offer of dedication of a drainage easement within the natural watercourse; and (3) never took any affirmative steps exhibiting dominion and control, such as improving, maintaining, or repairing the creek bed.  (*Id.* at pp. 568-570.)  The Court of Appeal affirmed, holding that even though a public entity's use of private land for a public purpose over time may constitute implied acceptance of an offer of dedication—the public entity must still take affirmative steps exhibiting dominion or control over the property by participating in its improvement, maintenance, or repair to evidence the public entity's acceptance and, therefore, support a finding of public use.  (*Ibid.*)  Although the subject property was part of the drainage system of a larger 40-acre watershed—that alone was insufficient:

> "By expressly rejecting the offer of dedication, the public entities demonstrated they were foregoing any public use of the property. Although the creek was a part of the drainage system which drained a 40-acre watershed, the absence of dominion and control exhibited by the public entities, supports the trial court's finding of no public use."  (*Ullery*, *supra*, 202 Cal.App.3d at p. 570.)

Describing conduct that would have constituted implied acceptance of the offer of dedication, *Ullery* states, "Official acts of dominion and control constituting acceptance of the private drainage system can be shown if the public entity does maintenance and repair work."  (*Ullery*, *supra*, 202 Cal.App.3d at p. 568.)

Thus, *DiMartino*, *supra*, 80 Cal.App.4th 329 and *Ullery*, *supra*, 202 Cal.App.3d 562 stand for the proposition that a privately owned drain pipe on private property, for which the public entity has expressly rejected an offer of dedication, does not become a public work merely because "public water" drains through it.  The public entity must do

14

more to impliedly accept an offer of dedication that it previously expressly rejected.

*Marin*, *supra*, 111 Cal.App.3d 591 answers the question—how much more?[8] There, homeowners sued for inverse condemnation after a storm drain pipe under their home failed. A previous owner had laid the pipe in a natural watercourse. What distinguishes *Marin* from *DiMartino* and *Ullery* is that the public entity there was substantially involved in installing the privately owned pipe. For example, a surveyor employed by the public entity instructed the property owner " 'exactly what pipe to lay and how to do it.' " Then, the public entity provided the trucks, dirt, and water to complete the installation. (*Marin*, at p. 594.) After installation, the city-employed surveyor inspected the pipe. (*Ibid*.) On those facts, the appellate court reversed a defense judgment, holding that the plaintiffs' damages resulted from the City's "maintenance and use of a public improvement . . . ." (*Id*. at p. 596.)

Ruiz's case is squarely within *DiMartino*, *supra*, 80 Cal.App.4th 329 and *Ullery*, *supra*, 202 Cal.App.3d 562. As in those cases, here the undisputed evidence is the County did nothing demonstrating dominion or control of the Ruiz pipe. There is no evidence that any County employee participated in planning, constructing, maintaining, inspecting, or repairing the Ruiz pipe. The County had no right of access to the Ruiz pipe; it is entirely on private property. Moreover, by expressly rejecting the offer of

---

8      To the extent the court in *Marin* applied an absolute liability standard, an issue not involved here, it was disapproved in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 447-448 (*Bunch*).

dedication, the County demonstrated that it was not accepting any maintenance obligation.

Although the Ruiz pipe is part of a system that drains the Valley watercourse, *DiMartino* and *Ullery* hold that such use alone—even over an extended period of time (in *DiMartino*, 40 years)—is legally insufficient to constitute an implied acceptance of a drainage easement. (*DiMartino*, *supra*, 80 Cal.App.4th at p. 343; *Ullery*, *supra*, 202 Cal.App.3d at p. 570.) Indeed, the Court of Appeal in *DiMartino* rejected the same argument Ruiz makes here—i.e., the public entity's use of the privately owned pipe for an extended time period as part of a public storm drain system, by itself, establishes implied acceptance of a drainage easement or transforms the private property into a public work. (*DiMartino*, at p. 339.) The *DiMartino* court explained that such an assertion "separates *Marin* [*supra*, 111 Cal.App.3d 591] from its facts, particularly ignoring . . . evidence that [the pipe in *Marin*] was installed under the supervision of the city engineer . . . ." (*DiMartino*, at p. 339.) Here, as in *DiMartino*, "[t]here is simply no evidence of any actions of [the public entity] from which the court could infer substantial participation in the construction, management or operation of the storm drainpipe or the exercise of dominion and control by [the] public entity." (*Id.* at p. 340.)

Additionally, in *DiMartino* the appellate court also noted that the "purpose of the pipe appears to have been entirely private: to permit construction of private residences" on lots that otherwise would have been unbuildable "due to waters flowing in a natural watercourse." (*DiMartino*, *supra*, 80 Cal.App.4th at p. 344.) Similarly here, before development, surface waters drained across the Property in an open ditch. Even Ruiz's

16

expert testified that the pipe is located "in a natural watercourse."  Thus, the undisputed evidence is that although the natural watercourse *on* Ruiz's property serves the Valley, the pipe *under* Ruiz's property serves their development interests alone.

D.  *Ruiz's Arguments are Unpersuasive*

1.  *Factual arguments*

Disagreeing with this analysis, Ruiz makes several broad factual assertions.  For example, Ruiz contends *DiMartino* is distinguishable because the underground pipe there "was not an integrated part of the public storm drain system" but instead a "rogue pipe that was not needed or used by the [public entity] to control its stormwaters."  However, we read the case differently.  In *DiMartino*, "surface storm water inlets" under a public street led to underground pipes connecting to a pipe under the plaintiffs' home, which in turn "came to the surface at its exit into the natural watercourse on the western edge of the plaintiffs' property."  (*DiMartino*, *supra*, 80 Cal.App.4th at p. 332.)  Thus, the privately owned pipe in *DiMartino* was connected to the public storm drain system.

Ruiz also contends that "*mos*t of the water that flows through the pipe originates in the County . . . ."  (Italics added.)  However, the record shows otherwise.  Morrison conceded he had "no way of apportioning the amount of water contributed . . . to this drainage system" as between the County and City.  Indeed, Morrison could not even state whether water from public streets in the County's jurisdiction caused Ruiz's damages:

> "Q:  And because you've not done a hydrology study and you've never calculated the area of the public streets, of the County streets, in the drainage area, you cannot say whether those

17

public streets contributed flow that was damaging to the [Ruiz] property in this case?

"A: Correct."

Ruiz further asserts, "There is no evidence that the pipe beneath [the Property] replaced a natural watercourse." Elaborating, Ruiz claims that the County did not replace a natural stream with drainage improvements, but rather *diverted* water that otherwise would have flowed elsewhere to the Property, "conduct which constitutes a taking." (Italics added.) However, the record also belies this assertion. Morrison testified that the Ruiz pipe *is* in a natural watercourse. Ruiz's attorney elicited this testimony himself:

"Q: Have you seen evidence that the pipe running through the Ruiz' property actually replaced a natural water course?

"A: Yes."

Surprised by this concession, county counsel asked Morrison the same question and got the same answer:

"Q: Did I hear that correctly, that it's your opinion that the pipe on the [Ruiz] property was located in a natural water course?

"A: That would be my understanding."[9]

Now on appeal, Ruiz attempts to discredit this testimony, asserting that Morrison "did not state the evidence on which that conclusion was based" and he had " 'little information' " about the relevant improvement plans. However, this testimony drew no

---

[9] In closing argument, county counsel explained, "Morrison also testified . . . that the pipe on the [Ruiz's] property was put in a natural watercourse. That surprised me because I've been trying to get that established for this whole case."

18

objection at trial, and by eliciting this evidence themselves—from their own retained expert no less—Ruiz "are hardly in a position to object" on lack of foundation grounds now. (See *Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 38-39.)

Citing *Skoumbas*, *supra*, 165 Cal.App.4th at page 791, Ruiz also asserts that cases involving a natural watercourse (such as *Locklin*) should not be followed because "[s]urface water passing through a pipe does not constitute a watercourse." However, in *Locklin*, the California Supreme Court stated, "Alterations to a natural watercourse, such as the construction of conduits or other improvements in the bed of the stream, do not affect its status as a 'natural' watercourse." (*Locklin*, *supra*, 7 Cal.4th at p. 345.) Neither the cited page nor any other language in *Skoumbas* states otherwise. Indeed, citing *Locklin*, the Court of Appeal in *Skoumbas* acknowledged that a pipe placed in a natural watercourse is considered a natural watercourse. (*Skoumbas*, at p. 795, fn. 13.)[10]

In a related argument, Ruiz asserts that "the evidence did not conclusively prove that the pipe replaced a concrete drainage channel." Again, however, the record refutes this assertion. Viewing a photograph of the exposed Ruiz pipe, Morrison testified:

> "Q: Do you see this large piece of concrete—flat concrete leaning up against the right hand side of the hole?
>
> "A: Yes.
>
> "Q: Do you believe that this is the visible portion of the pre-existing concrete trapezoidal drainage ditch?

---

10    For this reason, we reject Ruiz's argument that *Locklin*, *supra*, 7 Cal.4th 327 and *Ullery*, *supra*, 202 Cal.App.3d 562, both of which involve a natural watercourse, are distinguishable on this basis.

19

"A: I think that is what we are looking at."

Moreover, Ruiz acknowledges that before development, the Valley contained a natural stream running through their subdivision. Morrison testified that this stream was the "main water course" draining the Valley. Morrison inspected design plans for the Property's development. The plans showed the original stream was replaced with a concrete drainage channel—the main watercourse out of the Valley. Morrison further testified that the plans show the concrete channel was replaced by the underground pipeline that exists today. Morrison testified that the developer constructed the underground pipeline "into that water course or into the location of the water course."

Ruiz also asserts that "the trial court made no finding that the pipe either replaced a watercourse or was itself a natural watercourse." That is true; the statement of decision omits such a finding. However, in objections to the initial statement of decision, the County called the court's attention to this omission and urged the court to make that finding. Therefore, we do not imply a finding favorable to Ruiz. (Code Civ. Proc., § 634.)[11]

---

[11] "When a statement of decision does not resolve a controverted issue . . . and the record shows that the omission . . . was brought to the attention of the trial court . . . prior to entry of judgment . . . it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.)

20

### 2. *Legal arguments*

#### a. *Skoumbas*

Ruiz also disagrees with our legal analysis, primarily asserting that *Skoumbas*, *supra*, 165 Cal.App.4th 783 is "the most applicable case" and compels that the judgment be affirmed. More specifically, Ruiz asserts that "[j]ust like the plaintiffs' [*sic*] in *Skoumbas*, the Ruiz family was harmed when the piped storm drain system that the County used as part of its integrated storm drain system failed due to a lack of maintenance."

This argument fails because the facts and legal issues in *Skoumbas* are materially different from those here. First and foremost, *Skoumbas* does not involve the failure of an underground pipe owned by the plaintiffs. Rather, the damage was caused when an upstream pipe not owned by the plaintiffs discharged water *onto* their property. (*Skoumbas*, *supra*, 165 Cal.App.4th at p. 787, italics added.) The *Skoumbas* court itself noted the significance of such a distinction, stating, "[T]his case does not involve the failure . . . of a secret subterranean drain. It involves potential liability for the diversion of surface water." (*Skoumbas*, at pp. 795-796.)

The legal issue in *Skoumbas* is also materially different from the ones here. In *Skoumbas*, the public entity sought summary judgment, asserting that although it owned the road, the catch basin, and the first 40 feet of drainpipe, it was not responsible for any flow of water below the first 40 feet because the rest of the pipe was privately owned. (*Skoumbas*, *supra*, 165 Cal.App.4th at p. 787.) Thus, the legal issue was whether as a matter of law, private ownership of any part of the pipeline was a complete bar to the

plaintiff's potential recovery. (*Id.* at p. 794.) The Court of Appeal reversed summary judgment, explaining, "[T]he critical inquiry is not whether the entire [drainage] system was a public improvement, but rather whether [the public entity defendant] acted reasonably in its maintenance and control over those portions of the drainage system it does own." (*Id*. at p. 787.)

*Skoumbas* expressly declined to address whether a public agency's mere use of a privately owned pipe impliedly accepts an offer of dedication previously expressly rejected. (*Skoumbas*, *supra*, 165 Cal.App.4th at p. 796, fn. 14.) "[C]ases are not authority for propositions not considered." (*Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 169.)

b. *Marin*

Ruiz also relies on *Marin*, *supra*, 111 Cal.App.3d 591 in urging that their pipe had become part of a public work of improvement because storm drain water from the large County system ran through it. However, as discussed *ante*, the public entity in *Marin* did not merely use the private pipe—it directed and substantially participated in its installation. (*Marin*, at p. 594.) *Ullery* distinguished *Marin* on that very ground. (*Ullery*, *supra*, 202 Cal.App.3d at pp. 569-570.)

Thus, although the Ruiz pipe is part of a public drainage system, that fact alone is insufficient evidence to support a finding that the County impliedly accepted an offer of dedication or otherwise converted the pipe into a public work. (*Ullery*, *supra*, 202 Cal.App.3d at pp. 570-571.) Absent an easement or accepted dedication, liability is imposed on a public entity only when the public entity has exercised dominion and

22

control over the private property.  (*Ibid*.; *DiMartino*, *supra*, 80 Cal.App.4th at p. 343.)
Ruiz concedes that the County had nothing to do with the installation, maintenance, or
inspection of their pipe.  Accordingly, even viewing the evidence in the light most
favorable to Ruiz, there is insufficient evidence to support the court's finding of implied
acceptance of dedication.

### c.  *Supervisor's advice*

After the flooding, Mr. Ruiz threatened to pour enough concrete in their pipe to
completely block upstream flow.  A County supervisor replied, "I don't advise that you
do that" because upstream homes would flood as a result.  Ruiz contends the supervisor's
statement supports a finding that the pipe is a public work because "the entire system
could fail" if their pipe was completely obstructed.

This argument is not persuasive for several reasons.  First, upstream properties
will inevitably flood if the downstream watercourse is blocked.  That is why both
upstream *and* downstream owners have a duty to act reasonably with respect to each
other's property.

> " 'It is . . . incumbent upon every person to take reasonable care in
> using his property to avoid injury to adjacent property through the
> flow of surface waters.  Failure to exercise reasonable care may
> result in liability by an upper to a lower landowner.  *It is equally the
> duty of any person threatened with injury to his property by the flow
> of surface waters to take reasonable precautions to avoid or reduce
> any actual or potential injury*.' "  (*Locklin*, *supra*, 7 Cal.4th at p. 352,
> italics added.)

The supervisor's comment simply urged Mr. Ruiz to act reasonably, which may
have been good advice.  (*Martinson v. Hughey* (1988) 199 Cal.App.3d 318, 321, 330

23

[affirming judgment enjoining downstream owner from obstructing the flow of water off upstream property and awarding upstream owner damages].) In any event, this single and isolated comment is significantly different from the type of dominion or control courts have found necessary to support a finding of an implied acceptance of dedication. (*Ullery*, *supra*, 202 Cal.App.3d at pp. 568-570; *Marin*, *supra*, 111 Cal.App.3d at p. 594.)

### d. *California Constitution, article I, section 19, subdivision (e)(5)*

Article I, section 19 of the California Constitution provides in part:

> "(a) Private property may be taken or damaged for a *public use* and only when just compensation . . . has first been paid to, or into court for, the owner. . . .

> "(b) The State and local governments are prohibited from acquiring by eminent domain an owneroccupied residence for the purpose of conveying it to a private person.

> "[¶] . . . [¶]

> "(d) Subdivision (b) of this section does not apply when State or local government exercises the power of eminent domain for the purpose of acquiring private property *for a public work or improvement*.

> "(e) For the purpose of this section:

> "[¶] . . . [¶]

> "5. 'Public work or improvement' means facilities or infrastructure for the delivery of public services such as . . . flood protection . . . water-related and wastewater-related facilities or infrastructure . . . *and private uses incidental to, or necessary for, the public work or improvement*." (Cal. Const., art. I, § 19, italics added.)[12]

---

[12] Undesignated references to article I are to the California Constitution.

24

Asserting that "[t]he California Constitution defines a public improvement to include " 'water-related . . . facilities or infrastructure" and incidental "private uses," Ruiz contends that as a matter of law, their privately owned pipe is a public improvement.[13] To resolve this issue, it is important to review the history of these provisions, which amended the California Constitution by the passage of Proposition 99 in 2008 (Prop. 99). (Historical Notes, 1D West's Ann. Cal. Const. (2012 ed.) foll. art. I, § 19, pp. 332-333 [Historical Notes].)

Proposition 99 was intended to reform eminent domain law in the wake of *Kelo v. City of New London* (2005) 545 U.S. 469 by limiting eminent domain of owner-occupied homes:

> " 'By enacting this measure, the people of California hereby express their intent to: [¶] "(a) Protect their homes from eminent domain abuse. [¶] "(b) Prohibit government agencies from using eminent domain to take an owner-occupied home to transfer it to another private owner or developer." (Historical Notes, *supra*, at p. 333, § 19, subds. (a)-(b).)

To effectuate this intent, article I, section 19, subdivision (b) prohibits state and local governments from acquiring by eminent domain an owner-occupied residence to convey it to a private person.

However, this prohibition was not nearly as sweeping as might appear from subdivision (b) alone. Again, before examining the text of this law, some historical

---

[13]    In *Skoumbas*, an identical issue was raised; however, the court found it unnecessary to decide and expressed no opinion on the point. (*Skoumbas*, *supra*, 165 Cal.App.4th at p. 796, fn. 14.)

background places it in context. Proposition 99 "was put on the ballot by . . . pro-condemnation groups for the purpose of forestalling the more restrictive Proposition 98 (sponsored by property rights advocates)." (Ilya Somin, *The Limits of Backlash: Assessing the Political Response to Kelo* (2009) 93 Minn. L. Rev. 2100, 2146.) Proposition 99 included a provision negating Proposition 98 in the event Proposition 99 received more votes, which is what occurred. (Historical Notes, *supra*, at § 19, p. 333.)

The broad prohibition on eminent domain in article I, section 19, subdivision (b) is narrowed by subdivisions (d) and (e). Under subdivision (d), the prohibition in subdivision (b) does not apply when private property is taken for a "public work or improvement." Subdivision (e)(5) broadly defines "public work or improvement" to *include* "private uses incidental to, or necessary for, the public work or improvement." Thus, some of what Proposition 99 took away from state and local government in subdivision (b) was given right back in subdivisions (d) and (e).

Having seen how article I, section 19, subdivisions (b), (d), and (e) relate to each other, we now consider subdivision (a). Subdivision (a) contains the provision requiring the government to pay just compensation. It states in part: "Private property may be taken or damaged *for a public use* and only when just compensation . . . has first been paid to, or into court for, the owner. . . ." (Cal. Const., art. I, § 19, subd. (a), italics added.) Thus, subdivision (a) is the source of liability for inverse condemnation. By its own terms, such liability requires "a public use" of the property.

Article I, section 19 does not define "public use" as it appears in subdivision (a). Subdivision (e)(5) defines a different term: "Public work or improvement," which appears in subdivision (d), not subdivision (a).

Although Ruiz does not openly acknowledge it, their argument assumes that the definition of "public work or improvement" in subdivision (e)(5) also defines "public use" in subdivision (a). However, Ruiz provides no analysis or citation to any authority to support that assumption. More to the point, the plain language in article I, section 19, subdivision (e)(5) shows it does not define "public use." Rather, it defines "public work or improvement." Article I, section 19 uses "public work or improvement" only in setting forth an exception to the prohibition created in subdivision (b). Article I, section 19 does not use "public work or improvement" in establishing inverse condemnation liability under subdivision (a). Accordingly, contrary to Ruiz's assertion, Article I, section 19 does not compel a finding that a privately owned storm drain pipe connected to a public storm drain system is a public use for purposes of imposing inverse condemnation liability.

## II. *THE TRIAL COURT'S FINDING THAT THE COUNTY ACTED UNREASONABLY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE*

As an alternative basis for imposing inverse condemnation liability, the trial court determined that the County acted "unreasonably in not making any effort to ensure that the [County] was not damaging the [Ruiz] pipe." The County contends this legal conclusion is also unsupported by substantial evidence.

A public agency "engages in a privileged activity when it drains surface water into a natural watercourse or makes alterations to the watercourse." (*Locklin*, *supra*, 7 Cal.4th at p. 367.) The public entity is liable for inverse condemnation only if it exceeds the privilege by acting unreasonably. (*Ibid.*)

Relevant here, *Locklin* held that "[w]hen alterations or improvements on upstream property discharge an increased volume of surface water into a natural watercourse, and the increased volume and/or velocity of the stream waters or the method of discharge into the watercourse causes downstream property damage, a public entity, as a property owner, may be liable for that damage. The test is whether, under all the circumstances, the upper landowner's conduct was reasonable." (*Locklin*, *supra*, 7 Cal.4th at p. 337.) The test for reasonableness "requires consideration of the purpose for which the improvements were undertaken, the amount of surface water runoff added to the streamflow by the defendant's improvements in relation to that from development of other parts of the watershed, and the cost of mitigating measures available to both upper and downstream owners. Those costs must be balanced against the magnitude of the potential for downstream damage." (*Ibid.*)

The County contends there is "no evidence" to support the finding that it acted unreasonably. We agree. In the trial court, Ruiz asserted "the unreasonable conduct is the failure to maintain this thing [the Ruiz pipe] despite using it for 50-plus years." Again on appeal, Ruiz asserts, "it was unreasonable for the County to continue using the pipe without maintaining it." Echoing Ruiz's argument, the trial court found the County

acted unreasonably "in not making any effort to ensure that [it] was not damaging the pipe."

It is true that prior to the Ruiz flooding, the County did not maintain or even inspect the Ruiz pipe. However, in determining whether the County acted unreasonably in this context, "the critical inquiry" is not whether the public entity acted reasonably with respect to someone else's property, but whether "the [public entity] acted reasonably in its maintenance and control over those portions of the drainage system it does own." (*Skoumbas*, *supra*, 165 Cal.App.4th at p. 787.) Thus, the relevant question is not the one Ruiz frames and the trial court's finding addressed—whether the County unreasonably failed to maintain the Ruiz pipe—rather, the issue is whether the County's ownership, operation, or control of *its property* created an unreasonable risk of harm to Ruiz's property. (*Id.* at p. 794.)

There is no evidence to sustain even an implied finding that the County acted unreasonably with respect to County property. To the contrary, the undisputed evidence on this point, from Ruiz's own expert, was that because of the many homes in the tributary area, water from those *private properties alone* (for example, irrigation or washing cars) was enough to cause the Ruiz pipe to rust and fail.[14] There was no evidence—zero—that the County could have designed or operated any feasible alternative drainage system with lower risks to the Property. Morrison could not even

---

14    This evidence caused county counsel to remark, "[W]e were now being accused of damaging private property with private water . . . ."

29

state whether public streets "contributed flow that was damaging to the [Ruiz's] property in this case."[15] Morrison had *no opinion* of whether the design, construction, or maintenance of County-owned property in the drainage area caused or even contributed to Ruiz's flooding.

Moreover, even assuming, for the sake of argument, there was sufficient evidence to sustain a finding of unreasonable County conduct, on this record the judgment would still have to be reversed. Under *Locklin*, "an owner who is found to have acted unreasonably and to have thereby caused damage to downstream property, is liable only for the proportion of the damage attributable to his conduct." (*Locklin*, *supra*, 7 Cal.4th at p. 338.) In other words, under *Locklin*, liability is several, not joint. (*Ibid*.)

Here, there was undisputed evidence that the County was not responsible for a significant amount of the drainage. Morrison testified that a "fair amount" of the flow in the Valley watercourse originates in City—not County—jurisdiction.[16] However, Morrison did not conduct a hydrology study that was necessary to apportion drainage, nor

---

15     By way of contrast, *Contra Costa County v. Pinole Point Properties, LLC* (2015) 235 Cal.App.4th 914 is a case where liability was based on a property owner's failure to maintain his *own* property, causing flooding to downstream property. There, a private property owner knew or should have known of an existing large drainage channel *on its property* and the need to maintain it to prevent flooding downstream development. (*Id.* at pp. 923-924.) That evidence supported the trial court's conclusion that the private owner acted unreasonably by failing to keep the drainage channel free of debris. In sharp contrast here, there is no evidence that the County failed to reasonably maintain its property in the tributary area.

16     Ruiz contends that "most of the water" originates on County streets; however, after sustaining county counsel's objection, the court ordered that testimony stricken.

did he have any information that would have enabled him to apportion among other property owners in the tributary area:

> "Q: And again, because you have not done a hydrology study of the drainage area, you have no way of apportioning the amount of water contributed to this watershed, to this drainage system as between the City of San Diego jurisdiction and the County of San Diego jurisdiction, correct?
>
> "A: That's correct.
>
> "Q: And you have no opinion and have offered no opinion that would allow you to apportion between the amount of water contributed to this watershed and this drainage system by the privately owned properties in the watershed, is that correct?
>
> "A: That's correct.
>
> "Q: Or by the school that's located partially in this drainage area, right?
>
> "A: Yes.
>
> "Q: Or the churches.
>
> "A: Yes.
>
> "Q: Or the shopping centers.
>
> "A: Yes.
>
> "Q: Or the apartment complexes.
>
> "A: Yes."

"An owner . . . whose conduct has a relatively minor impact on the stream flow in comparison with the combined effect of actions by owners in the upper reaches of the watercourse may not be held liable for any damage caused by the stream flow beyond the proportion attributable to such conduct."  (*Locklin*, *supra*, 7 Cal.4th at p. 360.)  In this

case, it was Ruiz's burden as plaintiff to "establish the proportion of damage attributable to the public entity from which recovery was sought." (*Id.* at p. 372.) The complete absence of *any* evidence upon which to apportion damages—as Ruiz's expert himself conceded—independently compels the 100 percent liability judgment against the County to be reversed. (*Ibid*.)

Disputing this analysis, Ruiz contends *Locklin* is distinguishable because there, the plaintiff sued five public entities, alleging each caused flooding. Ruiz asserts, "Having undertaken the burden to prove those allegations as to each defendant, the plaintiff was found to have been required to allocate liability amongst those five defendants. Without citing any additional authority, Ruiz claims that because they chose to sue only the County, it was the County's obligation to prove "that any of the damaging water originated" from other sources.

We do not read *Locklin* as placing the burden of proof of apportionment on the defendant. Like Ruiz, the plaintiffs in *Locklin* also failed to sue all of the property owners in the watershed. (*Locklin*, *supra*, 7 Cal.4th at p. 339, fn. 2 ["Less than 7 percent of the property in the watershed is owned by defendants. Numerous other public and private entities are owners of riparian property upstream from plaintiffs"].) As to the named defendants in *Locklin*, the Court held liability was several and not joint. (*Id.* at p. 372.) Moreover, the *Locklin* court also held that the plaintiffs' claim against the county in that case—based on water runoff from county roads—also failed because "[t]he evidence did not establish that any damage was attributable to that runoff." (*Id.* at p. 374.)

32

In both *Locklin*, *supra*, 7 Cal.4th 327 and *Bunch*, *supra*, 15 Cal.4th 432, the California Supreme Court stated, "If the public entity's conduct is unreasonable and a substantial cause of damage, the entity " 'is liable only for the proportionate amount of damage caused by its actions.' " (*Bunch*, at p. 436, quoting *Locklin*, at p. 368.) The principles discussed in these cases "reflect the Supreme Court's adoption of flexible principles in order to reach a result that is equitable, which recognizes the importance of public works projects, and which ensures that the public entity be liable only for the proportionate amount of damage caused by its actions." (*Odello Bros. v. County of Monterey* (1998) 63 Cal.App.4th 778, 788.) Ruiz was free to sue only the County; however, the recovery against any defendant cannot exceed that defendant's proportionate share of damages. (*Bunch*, at p. 436; *Locklin*, at p. 368.)[17]

Ruiz asserts that as a matter of policy, they "should not have to bear the burden of a storm drain system which serves the general public." We sympathize with the situation Ruiz find themselves in, which can be traced all the way back to their purchasing the Property unaware of the pipe's existence. We also agree with them that property owners should not be required to contribute more than their fair share to a public undertaking. However, that policy must be balanced with the "possibility that imposing open-ended liability on public entities charged with creating and maintaining flood control

---

[17]   Because of this disposition, it is unnecessary to consider the County's additional contentions, including its argument that the court applied a legally incorrect measure of damages.

33

improvements will discourage the development of needed public works." (*Bunch*, *supra*, 15 Cal.4th at p. 450.) The legal principles developed in the cases we apply to this record are an outgrowth of courts having balanced these policy considerations, and compel reversal.

III. *THE AWARD OF ATTORNEY FEES AND COSTS MUST BE REVERSED*

Code of Civil Procedure[18] section 1036 provides for an award of attorney fees and costs to a successful plaintiff in an inverse condemnation proceeding.[19] After judgment, the court awarded Ruiz $425,000 in attorney fees, plus $104,540.40 in costs. The County separately appealed from that order; on our own motion, we consolidated the two appeals.

Ruiz's attorneys worked under a 40 percent contingency fee agreement. Based on a $328,033 damage award, the contingency fee is about $131,200. Citing *Pacific Shores Property Owners Assn. v. Department of Fish & Wildlife* (2016) 244 Cal.App.4th 12, the County contends that the amount awarded ($425,000) is erroneous as a matter of law

---

[18] Undesignated statutory references are to the Code of Civil Procedure.

[19] "In any inverse condemnation proceeding, the court rendering judgment for the plaintiff by awarding compensation, or the attorney representing the public entity who effects a settlement of that proceeding, shall determine and award or allow to the plaintiff, as a part of that judgment or settlement, a sum that will, in the opinion of the court, reimburse the plaintiff's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of that proceeding in the trial court or in any appellate proceeding in which the plaintiff prevails on any issue in that proceeding." (§ 1036.)

because section 1036 limits fees to those "actually incurred . . . ." Ruiz disagrees, asserting the court had discretion to award more under *Salton Bay Marina v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914.

It is unnecessary to consider these arguments and we express no opinion on the issue. Because we have reversed the compensation award, the award of attorney fees and costs must also be reversed. Section 1036 provides for an award of "reasonable costs . . . including reasonable attorney . . . fees, actually incurred" where the court renders "judgment for the plaintiff by awarding compensation . . . ."

"Under the plain language of [§ 1036], since [Ruiz] will not receive a compensation award for inverse condemnation, they are not entitled to attorney fees." (*Buckley v. California Coastal Com.* (1998) 68 Cal.App.4th 178, 202.)

DISPOSITION

The judgment is reversed with directions to enter a new and different judgment in favor of the County of San Diego. The postjudgment order awarding attorney fees and costs is also reversed. In the interests of justice, the parties shall bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

AARON, J.

GUERRERO, J.

36

Filed 4/7/20

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SONIA RUIZ et al., | D074654 consolidated with D075355 |
| Plaintiffs and Respondents, | |
| v. | (Super. Ct. No. 37-2016-00004183-CU-EI-CTL) |
| COUNTY OF SAN DIEGO, | |
| Defendant and Appellant. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed March 17, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

HUFFMAN, Acting P. J.

Copies to:  All parties